## In re RURAL METRO CORPORATION Stockholders Litigation.

### C.A. No. 6350–VCL.

Court of Chancery of Delaware.

Submitted: Dec. 17, 2013.
Decided: March 7, 2014.

Joel Friedlander, Jeffrey M. Gorris, Jaclyn Levy, Bouchard, Margules & Friedlander, P.A., Wilmington, Delaware; Randall J. Baron, David Knotts, Robbins Geller Rudman & Dowd LLP, San Diego, California; for Plaintiffs.

Patricia R. Uhlenbrock, Seton C. Mangine, Pinckney, Weidinger, Urban & Joyce LLC, Wilmington, Delaware; Alan J. Stone, Daniel M. Perry, Milbank, Tweed, Hadley & McCloy LLP; for Defendant RBC Capital Markets, LLC.

## *OPINION*

LASTER, Vice Chancellor.

On June 30, 2011, Rural/Metro Corporation ("Rural" or the "Company") merged with an affiliate of Warburg Pincus LLC ("Warburg" or "WP"). Each publicly held share of Rural common stock was converted into the right to receive $17.25 in cash. The plaintiffs contend that the members of the Rural board of directors (the "Board") breached their fiduciary duties by approving the merger and by failing to disclose material information in the Company's definitive proxy statement (the "Proxy Statement"). The plaintiffs further contend that defendant RBC Capital Markets, LLC ("RBC") aided and abetted the directors' breaches of fiduciary duty. The directors settled before trial. So did Moelis & Company LLC ("Moelis"), a financial advisor that played a secondary role in advising the Board. The case proceeded to trial against RBC.

This post-trial decision holds RBC liable for aiding and abetting breaches of fiduciary duty by the Board. It does not specify a damages award against RBC or address the plaintiffs' application for fee shifting. The parties will submit further briefing on those issues in accordance with this opinion.

## I. FACTUAL BACKGROUND

Trial took place over four days. The plaintiffs proved the following facts by a preponderance of the evidence. In resolving factual disputes and drawing inferences, this decision has placed the greatest weight on the contemporaneous documents. This decision has placed the least weight on the testimony of the two RBC managing directors who appeared at trial.

Their accounts at times strained credulity, and the plaintiffs successfully impeached their testimony on multiple occasions.

## A. Rural And Its Board

Rural is a Delaware corporation headquartered in Scottsdale, Arizona. Founded in 1948, the Company is a leading national provider of ambulance and fire protection services in more than 400 communities across 22 states. Rural's shares traded on NASDAQ from July 1993 until the merger closed.

Before the merger, the Board had seven members. Robert Wilson, Eugene Davis, Earl Holland, Conrad Conrad, Henry Walker, and Christopher Shackelton were facially independent, disinterested, outside directors. Michael DiMino was Rural's President and CEO. Wilson did not vote on the merger.

Among the outside directors, Shackelton played the most significant role in the events leading up to the merger. Davis and Walker did more than the other outside directors but generally deferred to Shackelton. These individuals stood out because they were the members of a special committee (the "Special Committee") that took the lead on three M & A alternatives between August 2010 and March 2011. Shackelton served as Chair of the Special Committee on each occasion.

The Board first formed the Special Committee in August 2010. Some weeks earlier, RBC had pitched Shackelton and DiMino on the possibility of Rural acquiring American Medical Response ("AMR"), Rural's lone national competitor in the ambulance business. AMR was a subsidiary of Emergency Medical Services Corporation ("EMS"), a publicly traded entity that seemed more interested in its higher margin medical services subsidiary. The Board created the Special Committee to oversee an approach to AMR. Shackelton contacted EMS, but EMS was not interested in selling AMR at Rural's price.

In October, the Board reformed the Special Committee to respond to an approach by Macquarie Capital and Irving Place Capital (jointly, the "Consortium"). In late September, the Consortium expressed interest in acquiring Rural for $10.50 to $11.50 per share. The Board regarded that price as too low to justify engagement, but after talking with Shackelton, the Consortium suggested it could raise the high end of its range to $15.00 per share. The Board reaffirmed its position that "the Company was not for sale," but authorized the Special Committee to engage with the Consortium. Rural entered into a confidentiality agreement with them and provided them with due diligence. Discussions ended when Irving Place withdrew and Macquarie declined to proceed alone.

The plaintiffs do not contend that any director breached his duty of loyalty, but Shackelton, Davis, and DiMino each had personal circumstances that inclined them towards a near-term sale. Shackelton was a managing director of Coliseum Capital Partners, L.P. ("Coliseum"), a hedge fund he co-founded in 2006. Coliseum generates returns by taking concentrated positions in small-cap companies, obtaining influence, and then facilitating an exit within approximately three to five years. In 2007 and 2008, Coliseum accumulated approximately 12.43% of Rural's stock at an average cost of around $4 per share. Shackelton became a director in April 2008. By 2010, Rural had grown to 22% of Coliseum's portfolio—twice the target size for a core position—and the unrealized capital gain represented Coliseum's most successful investment. Shackelton saw an M & A event as the next logical step for Coliseum's involvement with Rural.

Shackelton's interest in an M & A event was also a reaction to DiMino's business plan. The Board hired DiMino with a mandate to grow the Company. When he arrived, DiMino discovered that Rural did not have a growth plan or a culture of growth. Predecessor management focused exclusively—and successfully—on operational improvements. To DiMino's amazement, the Company did not have a single sales person. To carry out his mandate, DiMino created a three part strategy: (i) acquire local and regional providers in the highly fragmented ambulance transport industry, (ii) enter new markets by securing contracts with hospitals for non-emergency, general transportation services, and (iii) secure new government contracts through the request-for-proposal process. DiMino developed and the Board approved a detailed growth plan that contemplated spending $50 million per year on acquisitions over the next five years. The evidence at trial proved that the growth plan was reasonable and achievable.

DiMino's growth plan conflicted with Coliseum's investment strategy, which favored companies with predictable cash flows. The fund told its investors that it avoided companies whose valuations relied on exceptional growth, was reluctant to buy into sizable growth initiatives, preferred a margin for safety based on modest organic growth assumptions, and often penalized companies for acquisitions.

In late 2010, Coliseum had yet another reason to favor an M & A event involving Rural. The fund was seeking to raise $150–$200 million of new capital, more than ever before. A Rural transaction would be a coup for the young, activist hedge fund and could be used to market the fund to new investors.

Davis had different reasons for favoring a sale. In fall 2010, Davis served on a dozen public company boards, which brought him into conflict with an ISS policy against "over-boarded" directors. Davis Dep. at 318. Davis was particularly concerned about avoiding a recommendation against his re-election as the Chairman of the Board of Atlas Air Worldwide Holdings, Inc. *Id.* at 319. Atlas Air facilitated a meeting between Davis and ISS, and Davis agreed to reduce his number of directorships to six by April 2011. *Id.* at 319–21. As President and CEO of PIRINATE Consulting Group LLC, Davis often joined boards as a hedge fund nominee or as an outside director acceptable to stockholder activists. A sale of Rural would reduce his number of board seats, while letting him exit on a professional high note. It also would let Davis keep over $200,000 of Rural equity that would vest on a change of control, but which he would lose if he resigned voluntarily. Davis set a personal deadline of April 1 for Rural to announce a sale; otherwise, he would resign from the Board.

DiMino was a late convert to the idea of a sale. During most of 2010, he favored keeping Rural independent. In September 2010, while Shackelton talked up the Company with private equity firms, DiMino politely resisted, arguing that the company was "on a clear growth plan" to increase revenue and EBITDA. JX 96. In the midst of the Special Committee's discussions with the Consortium, DiMino emailed Walker and Conrad, the Chairman of the Board at the time, and explained he "would wait to sell this business until after we are actually serving Santa Clara and after Stingray is purchased. Sometime after June of next year." JX 135. DiMino testified that waiting would allow the Company to demonstrate success executing its growth strategies:

I believed that the company would be much more valuable . . .—[The Santa

Clara contract and the Stingray acquisition] are two of our growth planks, part of our strategic plan that we already had implemented.... [E]ach one of those represented a success or a point of success ... on that plan that would, I think, have delivered more value to the shareholders once they saw that we actually accomplished that, and more valuable to outsiders as they looked at the business.

DiMino Dep. at 36–37 (June 10, 2011). DiMino contrasted his assessment with what Shackelton and RBC thought, namely that "now is the time to sell." JX 135.

DiMino changed his mind after his six month performance review. Shackelton and Davis believed that during his presentations to the Consortium, DiMino's body language conveyed his preference that the Company remain independent. They were incensed that DiMino had "undermined the process" to protect his job and "intentionally introduced enough concerns regarding the risks of buying the business to scare off buyers." JX 171. Shackelton also felt DiMino had engaged in "completely unacceptable behavior" by reaching out to a second private equity firm to validate the Consortium's bid and potentially generate price competition. JX 176 at COL0140372. Conrad and another outside director gave DiMino his review, but they gathered information from their fellow directors before doing so. The input from Shackelton and Davis was scathing. After his review, DiMino called Shackelton and received similar feedback directly. From that point on, DiMino supported a sale and deferred to Shackelton. According to Davis, self-interest also drove DiMino's change of heart:

> [T]he light bulb finally went over his head that [a private equity buyer would] probably ask him to run it, and given the way that his relationship with the Board—our Board had deteriorated, I think at some point, he came to the conclusion he would be better off with a different Board, and a new owner would bring a different Board, on top of which he was going to prematurely cash out on the equity that he had received less than a year earlier. And probably if he was given the job back, would get more equity. It was a very good deal for him. He finally figured it out.

Davis Dep. at 144–45.

To reiterate, the plaintiffs do not contend that any director breached his duty of loyalty. The personal circumstances that confronted Shackelton, Davis, and DiMino nevertheless helped shape the boardroom environment in which RBC operated.

## B. Rumors About EMS

In early December 2010, the Wall Street rumor mill began buzzing that EMS was in play. Tony Munoz of RBC gave Shackelton and DiMino an overview of the EMS process, told them that multiple private equity shops were looking at EMS, and reported that some of the private equity firms believed AMR should be separated from EMS. Munoz claimed that several of the firms were looking for a partner and had mentioned Rural as an "angle." Shackelton told Munoz that "[a]t the right price, we can be part of the 'angle.'" JX 177.

Internally, Munoz and his RBC colleagues realized that a private equity firm that acquired EMS might decide to buy Rural rather than sell AMR. Munoz and his colleagues recognized that if Rural engaged in a sale process led by RBC, then RBC could use its position as sell-side advisor to secure buy-side roles with the private equity firms bidding for EMS. RBC correctly perceived that the firms would think they would have the inside track on Rural if they included RBC among the banks financing their bids for

EMS, referred to in M & A argot as the "financing trees." RBC believed that with the Rural angle, it could get on all of the EMS bidders' financing trees.

On December 8, 2010, the Board held a regular meeting. Shackelton took the opportunity to discuss the rumors about EMS and segued into a full presentation about strategic alternatives. After explaining why he felt market conditions were conducive to M & A activity, Shackelton outlined what he saw as Rural's three strategic alternatives:

> (1) continue to pursue the Company's current standalone business plan (including taking advantage of opportunities to purchase smaller competitors); (2) pursue a sale of the Company; or (3) pursue a transaction that would seek to take advantage of the synergies available via some form of business combination transaction involving [AMR].

JX 180 at 3. Shackelton told the Board that he "had not formulated a preference among the three basic alternatives," but he "did recommend that the Company should move expeditiously to retain appropriate advisers and obtain advice regarding an appropriate course of action." *Id.*

Based on Shackelton's presentation, the Board re-activated the Special Committee. The Board charged the Committee with retaining advisors and generating a recommendation on the best course of action. It did not authorize the Special Committee to pursue a sale. At the same meeting, Shackelton took over as Chairman of the Board.

## C. Shackelton Takes Control.

After the Board meeting, Shackelton told RBC that he was open to reaching out to private equity firms about partnering on an acquisition of EMS. Shackelton gave a similar message to Moelis, a firm that had a relationship with Rural's CFO. Both firms began making calls to their sponsor clients. On December 9, 2010, DiMino reached out to the CEO of EMS to explore what Rural "[could] do to help" with their process. JX 183. The EMS CEO agreed that the companies should be put together at some point but otherwise demurred. He suggested they speak again in January.

On December 13, 2010, Shackelton advised his fellow directors that he was setting up a board meeting to interview potential financial advisors. On December 14, EMS publicly announced that it was exploring strategic alternatives. Its stock price spiked 19%. Rural's stock also traded up.

On December 20, 2010, Shackelton reported to his fellow directors that the Special Committee, not the full Board, would meet on December 23 to interview and select an advisor. He justified the date as follows: "The EMS process is moving more quickly than we'd anticipated. Over the past 5 days, we have been contacted by nine private equity firms that are either interested in partnering to buy EMS or turning the tables and acquiring us." JX 215. He argued that having the Special Committee hire the Company's advisors, rather than the full Board, was simply a matter of convenience: "Since the purpose of this call will not be to evaluate and select a strategic direction, I do not believe we need the entire board to block off four hours for the banker presentations." *Id.*

In advance of the Special Committee meeting, Munoz and his RBC colleagues continued speaking with private equity firms about EMS and Rural. Munoz told Shackelton that several private equity firms were interested in acquiring Rural and that "[t]he EMS process is helping us position Rural as a great target." JX 217.

On December 23, 2010, the Special Committee interviewed Houlihan Lokey, Moelis, and RBC. Houlihan Lokey stressed its

M & A experience in the healthcare sector with companies valued under $1 billion. The firm commented on the wide range of alternatives available to Rural. Its preliminary comments on a potential sale incorporated both private equity buyers and strategic acquirers.

Moelis stressed its growing M & A franchise. The bulk of its presentation examined a potential combination with AMR. Moelis placed less emphasis on a sale of Rural. The firm advised the Special Committee that it "would not seek to provide financing for any transaction that may be pursued (thereby reducing the potential for a conflict of interest in its activities on behalf of the company)." JX 224 at 1.

Munoz made the pitch for RBC. Unlike the other firms, RBC devoted the bulk of its presentation to a sale and recommended coordinating the effort with the EMS process. JX 225 at 4. RBC claimed that "selling the Company today is opportunistic" and that the time to sell "is now." *Id.* at 5. In addition to stressing the EMS process, RBC argued that the M & A healthcare environment was strong, that buyers were paying premiums for quality assets, and that other M & A opportunities were scarce. RBC advised that the debt markets were open and supportive of acquisition financing. *Id.* at 10. When laying out the structure of a potential sale process, RBC only discussed private equity firms. *Id.* at 33–35. RBC cited its close relationships with the private equity firms it rated as "Tier 1 Sponsors." *Id.* at 41. Despite having stated that the credit markets were open for acquisition financing, RBC noted that it hoped to offer staple financing to the potential buyers in any transaction. RBC did not disclose that it planned to use its engagement as Rural's advisor to capture financing work from the bidders for EMS.

According to the minutes of the meeting, after the banker presentations, counsel advised the Special Committee about RBC's proposal to provide staple financing. The minutes contain the following paragraph:

> Mr. Brooks explained further the "pros and cons" of retaining an investment banker as a financial advisor if that advisor would also seek to provide so-called "staple financing." A major concern in this case is that RBC's potential offer of staple financing would present for it potential conflicts of interest, and potential appearances of conflicts. However, in this case in particular, an argument could be made that RBC, with its very recent experience in working with the Company in obtaining significant debt financing, and its overall familiarity with the Company and its industry, would be expected to significantly enhance a potential sale process through staple financing because such financing could be offered quickly and could provide a floor for financing that would be available to potential purchasers of the Company. Mr. Brooks noted that, if the Committee were to select RBC, the Committee would need to be especially active and vigilant in assuring the integrity of the [process], and that it should consider appointing a second firm which would not be in a position to provide staple financing, but that would be very close to the process to assure both the fact and the appearance of an appropriate and robust auction process. Both firms should be in a position to deliver a customary "fairness opinion" in the event the Company determines to enter into a negotiated transaction. . . .

JX 224 at 2.

The Special Committee decided to hire RBC. DiMino emailed Munoz: "Well done, let's get this baby sold!" JX 229. Munoz reported to his colleagues at RBC that

they had been engaged as "Rural Metro Sellside." JX 230. He described Rural as "the deal that's going to put our Healthcare services sellside effort on the map. Big name sponsors are going to look at this asset." *Id.* Other contemporaneous documents confirm that RBC understood it was hired to sell Rural. *See* JX 251 (Munoz telling head of RBC leveraged finance that "[w]e're hired on the sellside on Rural [and] we are free to help on the overall financing of Rural + EMS. Likely be a $2bn financing."); JX 288 at 1 (internal RBC memo requesting authorization to provide staple financing; "Co has engaged RBC ... as sell-side advisors to explore the sale of the Co."); *id.* at 2 ("The current transaction presents an important Healthcare sell-side mandate for [RBC] in addition to being a large fee event.").

At the time, the Board had not authorized the Special Committee to hire a "sell-side" advisor or start a sale process. The Board only authorized the Special Committee to retain an advisor to analyze the range of strategic alternatives available and make a recommendation to the Board.

**D. Without Board Approval, Shackelton And RBC Put The Company In Play.**

After hiring RBC to sell Rural, Shackelton emailed DiMino about "discussing price range." JX 233. Shackelton also told DiMino that he was interested in having "a secondary m & a advisor (group that isnt [sic] providing staple financing) at the very least for [a] fairness opinion." *Id.* DiMino felt that RBC and Moelis "will do whatever it takes to ensure we are completing a transaction." JX 209.

On December 26, 2010, Shackelton sent an update to the Board reporting that the Special Committee had hired "RBC (as primary) and Moelis (as secondary)." JX 238. He then reported on the "Partner/sale process." *Id.*

We are continuing to refine a target list of PE firms (10–15). We have reached out informally to almost all of them over the past two weeks. . . .

. . .

Looking forward to the week of January 3rd, we are considering the benefits of more formally reaching out to 6–12 other PE in order to gauge their level of interest in Rural (either as a partner in an AMR acquisition or an acquisition target).

*Id.* In an email to his partner at Coliseum, Shackelton said he was "putting in a lot of effort to manage communication so we can continue pushing gameplan [sic] forward aggressively without having to take a step back." JX 240.

Meanwhile, RBC designed a process that favored its own interest in gaining financing work from the bidders for EMS. RBC divided the possible bidders into "Track 1 buyers" who were involved in the EMS process and "Track 2 buyers" who were not. RBC reached out to the Track 1 buyers in December "to let them know that [Rural] is in play." JX 243. RBC planned to contact the Track 2 buyers during the first week of January. RBC would "then 'officially' launch the sellside process the following week." *Id.* RBC prioritized the EMS participants so they would include RBC in their financing trees. RBC also planned to push its staple financing package for Rural. Munoz stressed to his leveraged finance colleagues that RBC had the inside track on financing because of Rural's confidentiality agreements.

RBC hoped to generate up to $60.1 million in fees from the Rural and EMS deals. RBC anticipated earning an M & A advisory fee of $5.1 million and staple financing fees of $14–20 million from the Rural deal.

JX 294 at 2. RBC also hoped to capture $14–35 million by financing a share of an EMS deal. JX 314 at 4. The maximum financing fees of $55 million were more than ten times the advisory fee, giving RBC a powerful reason to take steps to promote itself as a financing source at the expense of its advisory role.

### E. The Sale Process Encounters Readily Foreseeable Problems.

As Shackelton and RBC pressed forward with a near-term sale, they encountered the readily foreseeable problems associated with trying to induce financial buyers to engage in two parallel processes for targets who were direct competitors. It should have been clear from the outset, particularly to sophisticated market participants like Shackelton and RBC, that financial sponsors who participated in the EMS process would be limited in their ability to consider Rural simultaneously because they would be constrained by confidentiality agreements they signed as part of the EMS process and because EMS would fear that any participants in both processes would share EMS's confidential information with its closest competitor. At trial, Munoz admitted that these were obvious issues. 1 Trial Tr. 272.

The private equity firms gave RBC and Moelis precisely this feedback. As early as December 15, 2010, KKR made clear that because it was involved in the EMS process and had signed a confidentiality agreement and received non-public information as part of that process, KKR would be limited in its ability to discuss opportunities with Rural. JX 203. KKR later confirmed that it was not interested in Rural unless KKR acquired EMS and that "the most important consideration" for KKR would be the timing of the Rural process. JX 253. KKR thought "a simultaneous deal would be tough and running in 2 simultanous [sic] auctions where they would need [EMS] to be interested in [R]ural might be tough." Id. KKR asked if there was some ability "to stagger the two deals" so that the Rural process would commence shortly after the completion of the EMS process. Id. Bain Capital provided the same feedback. Id.

In January 2011, J.P. Morgan gave DiMino a presentation that recommended that Rural execute on its growth plan over the next year. J.P. Morgan saw Rural poised at an "Inflection Point" in which the Company was transitioning "[f]rom turnaround to early-stage growth story." JX 304A at 4. With new management at the helm, Rural had a "[g]rowth strategy in place" that was "being executed on," and it also had an "[a]cquisition platform with infrastructure in place for growth." Id. Consequently, there was "[p]otential for meaningful [Rural] stock price appreciation over the coming quarters as growth plan is executed on/realized." Id. J.P. Morgan cautioned against a near-term sale because the "logical strategic buyers" were "focused internally on change of control transactions," and because Rural's growth strategy had not yet played out sufficiently to justify a high multiple from private equity buyers. Id. J.P. Morgan recommended postponing a sale so that Rural could "execute[ ] [its] growth plan with further stock price appreciation while strategics are focused internally" and allow "[f]inancial sponsors/strategics [to] become increasingly interested over the next year or so once the larger strategic deals happen & close." Id. DiMino forwarded the presentation to Shackelton and RBC, but no one shared it with the rest of the Special Committee or the Board.

### F. Shackelton And RBC Receive First Round Bids.

In total, Shackelton, RBC, and Moelis contacted twenty-eight private equity

firms during late December and January. Of those, twenty-one executed confidentiality agreements and received the confidential information memorandum. Between January 21 and January 27, 2011, RBC distributed a bid instruction letter to the twenty-one firms. On January 29, Shackelton emailed the Board that he was "planning to receive first round bids this coming week." JX 308. The full Board had not met since December 8, 2010. The Special Committee had not met since December 23.

When the responses came in, they confirmed the problematic timing of the process. Fifteen firms declined to participate further, with several noting the difficulty of engaging in a dual process and the problems created by tax leakage if AMR was split off from EMS. Only one of the final bidders for EMS—CD & R—provided an indication of interest for Rural. Shackelton emailed his fellow directors that the Company received the following six indications:

American Securities—$16.00—$17.00
Ares—$14.50—$16.50
CD & R—$15.50—$16.50
Leonard Green—$17.00—$19.00
Warburg Pincus—$17.00
Kelso—$14.75—$16.50

JX 318. Shackelton decided to schedule management meetings with all six firms. CD & R later declined to participate further so it could concentrate on EMS.

The Board did not schedule a meeting to review the indications of interest or discuss next steps. The Special Committee met on February 6, 2011. RBC made a presentation that did not include any valuation metrics. DiMino asked privately for an analysis of potential LBO returns, and RBC gave him a two-page analysis showing that at prices of up to $18 per share, an LBO would generate five year internal rates of return for a financial sponsor that exceeded 20%. No one shared the analyses with the other Rural directors.

According to the minutes of the meeting, the Company's advisors raised for the first time that running a sale process in parallel with EMS presented "challenges regarding protection of the Company's confidential information and coordinating schedules with all of the [private equity] firms." JX 330 at 2. The Special Committee had not previously considered this complication.

According to the minutes, Shackelton asked Davis and Walker whether to include all six private equity firms in the next phase. By that time, Shackelton and RBC already had agreed to make a data room available to all bidders beginning the next day, February 7, and had scheduled meetings with all six firms to take place between February 9 and 18. Both Special Committee members agreed with the steps that Shackelton and RBC already had taken.

### G. The Response To CD & R

The Special Committee next met on February 22, 2011. RBC again made a presentation that did not include any valuation metrics.

RBC advised the Special Committee that Kelso had dropped out and that CD & R had won the bidding for EMS. Although RBC previously recommended a near-term sale process to capture the interest of the winner of the EMS auction, the Special Committee now balked at having CD & R participate. The minutes explain the concerns as follows:

[I]t was noted that, due to its pending purchase of EMS, CD & R may not be able to conform to certain aspects of the schedule outlined by the Company's advisors regarding a potential sale of the Company, although it should be able to

submit a timely definitive bid. It was further noted that CD & R should be seen as a competitor for the Company, causing certain confidentiality and antitrust issues to be considerations. JX 388 at 2.

Discussion ensued about whether the timeline for bids should be extended to accommodate CD & R. Davis emailed Shackelton, describing the discussion as "amateur hour." JX 389. The Special Committee resolved to set a bid deadline of March 21. The Special Committee also decided not to solicit interest from strategic acquirers.

After the meeting, RBC communicated the bid deadline to the remaining firms. Sean Carney, the leader of the Warburg team, emailed one of his partners and assessed Warburg's chances as follows:

> I think we are in a good position. [Di-Mino] likes us a lot, the bankers are pulling for us, and we are the premier firm involved in the process. My sense [is] the other participants include a bit of a motley group because the EMS process put so many of the larger firms on the sidelines. I think ~5 firms had management meetings, and [DiMino] did not like 2–3 and is basically constructively terminating their involvement by essentially being unwilling to meet with them. That leaves only 2–3, including ourselves, that are legitimate contenders.

JX 390. An internal Warburg presentation similarly noted that "[b]idders in the earlier and more high profile EMS sell-side process were not permitted into [the Rural] process, so we believe [Warburg] is the largest of the firms bidding on [Rural]." JX 392 at 3.

As the bid date approached, CD & R indicated to RBC that it could outbid other sponsors for Rural because of synergies with AMR. CD & R asked for the bid deadline to be pushed back until April so it could formulate its bid. Carney told RBC that Warburg did not want the bid deadline delayed.

## H. The March 15, 2011 Board Meeting

On March 15, 2011, the Board met to consider the Special Committee's progress for the first time since December 8, 2010, when the Board directed the Special Committee to hire an advisor and develop a recommendation on strategic alternatives. This court's opinion in the *Del Monte* case had come out approximately one month before, and emails during the intervening period suggest that counsel was worried about whether Rural's process was defensible. The minutes of the March 15 meeting have the feel of a document drafted in anticipation of litigation, and the rose-colored description of the sale process that appears in the minutes does not match up with what actually took place. Draft minutes for the Board meetings on October 1, 2010, and December 8, 2010, also were prepared at this time. *See* JX 408 & JX 409.

RBC made a presentation that once again did not contain valuation metrics. In fact, the Board had yet to receive any valuation materials in connection with the sale process. The only valuation materials the Special Committee had received were the banker pitch books on December 23, 2010. Before the March 15 meeting, Munoz recognized this omission and worried a director might ask about valuation. As a stopgap, he suggested pulling together a profile on CD & R's acquisition of EMS. *See* JX 398 ("Lets [sic] consider adding the EMS deal profile even if its [sic] an appendix. I'm worried that someone will ask about it and also ask our views on [Rural] valuation."). A colleague asked Marc Daniel, the lead RBC M & A banker, why Munoz thought an EMS deal profile would

help. *Id.* ("Why would we do one precedent and think that is prepared to discuss valuation?"). For internal purposes, RBC prepared a one-page deal profile on EMS. Using the publicly available multiple for EMS of 9.7 times 2010 adjusted EBITDA, the profile implied a value for Rural of $19.53 per share based on adjusted EBITDA and $22.82 per share based on pro forma adjusted EBITDA. JX 419. The deal profile was not distributed to the Board.

The minutes of the Board meeting on March 15, 2011, state that representatives of RBC and Moelis reviewed the timeline for the Company's sale process. JX 417 at 1. Recall that when the Board met on December 8, 2010, the directors had never actually authorized a sale process. They merely authorized the Special Committee to hire an advisor to identify alternatives and make a recommendation. It was Shackelton and RBC who expanded their mandate into a sale.

The minutes next state that RBC and Moelis representatives "commented upon the detailed oversight provided by the Special Committee of independent directors throughout the process, noting frequent formal and informal communications involving the full committee or its chair (Mr. Shackelton)," and "briefly discussed the formal meetings of the Special Committee that were held during the process." *Id.* This description, sadly, is false. The Special Committee held only two formal meetings: one on February 6, 2011, and one on February 22. Otherwise Davis was largely out of the picture because of his responsibilities at other companies, and Walker deferred to Shackelton.

Discussion then turned to CD & R's request for more time to submit its bid. RBC had designed the sale process ostensibly to give the winner of the EMS auction the opportunity to make a bid that included synergies. But because of factors that included "the risk to the Company's sale process of waiting for CD & R" and "the impact on the enthusiasm of other potential bidders," the Board decided not to extend the bid deadline. *Id.* at 2.

RBC next noted that the sale process had focused on financial buyers. RBC advised against contacting strategic buyers. According to the minutes, "it was noted that it was unlikely that any potential strategic purchaser not affiliated with a private equity firm would have an interest in [and] the ability to enter into a transaction on terms acceptable to the Company." *Id.* at 3.

The Board then adopted a resolution granting the Special Committee the authority that Shackelton and RBC had assumed for themselves. The key resolution states:

**NOW THEREFORE, BE IT RESOLVED,** the Board of Directors hereby ratifies and restates its delegation to the Special Committee of the exclusive power and authority to (i) determine whether a Potential Transaction is or may be, at this time, in the best interests of the Company and its stockholders, and report its recommendations to the full Board of Directors, (ii) retain and work with outside advisors in a controlled and contained process to seek from various financial institutions indications of interest and possible transaction terms in respect of a Potential Transaction, (iii) review and evaluate the terms and conditions of such indications of interest and determine the advisability of advancing further in respect of such proposals and/or whether other strategic alternatives in respect of the Company should be explored, (iv) if it deems appropriate, solicit proposals for a Potential Transaction that would be in the best interests of the Company's stock-

holders, (v) negotiate and finalize terms of any such Potential Transaction and, and [sic] (vi) report its findings and recommendations to the full Board of Directors.

*Id.* at 6.

After the meeting, RBC told the remaining bidders that the timeline would not be extended, although Rural later pushed out the deadline by twenty-four hours to March 22. Internally, RBC sought approval to fund up to 100% of a $590 million financing package for Warburg. JX 420. The memorandum noted that the Rural deal team was "working with Warburg Pincus on a final round bid." *Id.* at 1. In describing the "Economics/Business Case" for the financing, the memorandum stated:

> WP, covered by David Daniels, is a top tier client of the Financial Sponsors Group. RBC has an active dialogue with WP across all of its industry verticals and has generated—$6mm in fees from deals with this sponsor. We are supporting the proposed financing commitment associated with the purchase of [Rural] as it will further strengthen our relationship and lead to additional deal flow with WP.

*Id.* at 3. The anticipated fees from the staple financing were "$16.3MM for 100% [underwriting] or $8.2MM for 50% [underwriting]." *Id.* at 16. On March 18, 2011, RBC delivered signed commitment papers to Warburg. JX 430.

### I. Only Warburg Bids.

On March 22, 2011, Warburg offered to acquire Rural for $17.00 per share. It was the only firm to submit a final bid. When crafting its bid, Warburg understood that it had an advantage because of the timing of Rural's process. In an internal presentation, the Warburg team wrote, "Most large LBO firms conflicted out of evaluating [Rural] due to EMS process; we exit-

ed the EMS process early due to valuation issues." JX 441 at 2. The presentation noted that Warburg was "management's preferred partner" and described Warburg's bid of $17.00 per share as offering an "[a]ttractive risk/reward profile: low 20s IRRs, limited downside with principal loss highly unlikely, and several sources of upside opportunity." *Id.* Warburg assessed Rural as having "[s]ignificant future growth prospects, with potential margin improvement" and a "[s]trong CEO and experienced management team." *Id.* at 14. Warburg also viewed the industry as "[l]arge, growing, and fragmented . . . with attractive dynamics." *Id.*

Warburg's bid package had not used RBC's commitment papers. Rather than accepting defeat, RBC re-doubled its efforts to win the business. Carney testified that after Warburg submitted its bid, Warburg "had additional conversations with RBC because they continued to try to find a way into the financing. . . ." Carney Dep. at 52.

CD & R submitted an indication of interest at $17.00 per share, but stated that it was "unable to fully commit to a definitive transaction to acquire [Rural] until the closing of our acquisition of EMS, which is expected in late April." JX 445 at 1. CD & R wrote that it was "[h]ighly disappointed that despite our continued requests for a process extension, the final bid date for the [Rural] sale process has been set for a date that we are not able to accommodate." *Id.* CD & R explained that "[g]iven the synergies from a [Rural] and AMR combination, we continue to believe that such a transaction would result in the highest price for the [Rural] shareholders." *Id.*

The Special Committee and its advisors scheduled a meeting for March 23, 2011, to discuss the two proposals. With bids in hand, the relationship between RBC and

Shackelton changed. Before the bids, they were aligned in wanting the Company sold, and they worked together towards that goal. But RBC knew that Shackelton wanted more than $17.00 per share, while RBC just wanted a deal. From this point on, DiMino became RBC's principal ally in the boardroom. Like RBC, DiMino had an incentive to sell the Company and continue managing it for Warburg. In advance of the Special Committee meeting, Munoz scheduled a call with Shackelton "to manage him." JX 464.

Coliseum's internal models supported a base case valuation of $18.92 per share. Before the March 23 meeting, Shackelton personally accessed the Coliseum model, made some changes to the assumptions, and generated a base case valuation of $18.86. In notes to himself, Shackelton outlined his thoughts on the situation:

> On the fundamental side . . .
>
> Since we started this process the company has increased its value meaningfully:
>
> — Underlying business is cranking with another phenomenal quarter . . .
>
> — PMT has the potential to be a great acquisition
>
> — And the pipeline is full
>
> On the strategic side . . .
>
> We have an [sic] great opportunity in front of us to get more out of the bidders
>
> — WP is extremely sensitive to CDR/EMS and they are very focused on keeping their timing advantage (and rightfully so, given EMS, as a strategic, has the ability to pay a lot more for the business than WP)
>
> . . .
>
> I think we're nuts to take a price less than $18.00 . . .

> And I full heartedly [sic] believe that WP can get to $18.75 . . .
>
> I don't feel strongly about how we get there, but we should be targeting getting another $1.75 out of them.

JX 468.

Meanwhile, Munoz and his RBC colleagues debated whether to provide valuation materials to the Special Committee to enable them to evaluate the bids. RBC had delayed working on a fairness analysis because the firm still hoped to secure a buy-side financing role and did not want to render a fairness opinion under those circumstances. Munoz was again worried that RBC would be asked about valuation. JX 471 ("I'm . . . afraid board will ask us of our high level views today."). When Daniel told him that "wasn't the plan," Munoz fretted again: "Ok. But we will be asked and to convince [S]hackelton we need to show valuation. Perhaps we just put together 2–3 pages and just send to [S]hackelton." *Id.* The advisors ultimately prepared and circulated a one-page transaction summary that compared the metrics implied by a $17.00 per share offer to the metrics implied by Rural's closing market price of $12.38 on the prior day. JX 473. The $17.00 price looked great by comparison.

The directors who were not members of the Special Committee attended the March 23 meeting by invitation. Daniel orally reviewed the two bids. The Special Committee decided not to engage further with CD & R. According to the minutes,

> [T]he purported offer from CD & R did not provide the Company any certainty of a successful transaction, and did not otherwise present a compelling case for pursuing a transaction with CD & R at this time, given that it did not have committed financing and that it did not provide any indication of the merger agreement terms it would require.

JX 474 at 2. The directors did not have any valuation materials beyond the advisors' one-pager when they made this decision. The minutes do not reflect any discussion of the premise for RBC's design of the sale process, which was that the buyer of EMS could pay the most for Rural.

The Special Committee directed RBC and Moelis to engage in final negotiations with Warburg over price. RBC did not disclose that it was continuing to seek a buy-side role providing financing to Warburg. After the meeting, Munoz told DiMino to "start working the board." JX 488. Munoz advised him to stress that the "last time [the Company's] stock was at $17 was in 1998." JX 489. He also asked DiMino to "[l]et me know if you need more tidbits to help you." *Id.*

## J. The Final Price Negotiations

After the Special Committee meeting, Rural's bankers called Carney. Over the next twenty-four hours, Carney had numerous conversations with various bankers for Rural and Warburg. On the evening of March 24, Carney summarized the situation in an email:

> I have spoken to a number of bankers on our side (for advice) and theirs (for back-channel feedback). There are definitely two other offers as we suspected, both say they need another week of work but the company's bankers think it is more like 2–3 weeks. Sounds like both are higher but again not a knockout, I haven't been able to get more specific info than that.
>
> The BOD is split. Some are ready to vote yes for us now. Others want to try to get a little more from us, and some a lot more, with silly numbers like $18 being thrown around in the BOD room. The company's bankers think this may just be posturing in front of the bankers, and the bankers have told the BOD that

a number like that is not likely to happen ever and certainly not from us.

> I think our FL [fearless leader, Co–President Joe Landy] is probably more right than wrong. I think we probably win if we bump at all and $0.25 may be best in terms of helping the BOD drive to a quick consensus . . . .

JX 494; Carney Dep. at 13–14.

On Friday, March 25, 2011, Warburg submitted a revised final bid of $17.25 per share that expired at 9:00 a.m. Eastern time on Monday, March 28. The bid letter stated that it was Warburg's "best and final offer." JX 500. After receiving Warburg's bid, Shackelton called Carney to negotiate for a higher price. Shackelton asked for $17.50 per share, but Carney turned him down. Carney also talked to Rural's bankers about Warburg's revised bid, and he inferred from their tone that they were nervous. Carney Dep. at 248–51, 254–55; JX 510 ("I know their bankers are now nervous and want to get something done.").

## K. RBC Makes A Final Push For The Buy–Side Business.

The next day was Saturday, March 26, 2011, the day before the Board approved the merger. RBC spent that day working hard to get something done. On the buy-side financing front, RBC's most senior bankers made a final push. Blair Fleming, RBC's Head of U.S. Investment Banking, David Daniels, RBC's Co–Head of U.S. Financial Sponsors, and James Wolfe, RBC's Head of U.S. Leveraged Finance, engaged in a full-court press to convince Warburg to include RBC. As an inducement, Fleming offered to have RBC fund a $65 million revolver for a different Warburg portfolio company. On the deal front, RBC worked to lower the analyses in its fairness presentation so Warburg's bid looked more attractive. Munoz coordi-

nated between the senior bankers pressing for a financing role and the deal team working on the fairness presentation.

Many leading investment banks have a standing fairness committee staffed by senior bankers who oversee the opinion process and review opinions to ensure their quality and consistency. The RBC fairness committee is different. Its members consist of any managing directors who happen to be available and willing at the time a request for review goes out. At least two managing directors must respond and be willing to serve as the *ad hoc* fairness committee.

In Rural's case, the call for the available and willing went out at 10:00 p.m. on Friday, March 25, 2011, for a "committee" meeting the following morning. Ali Akbar and Allen Morton agreed to be the committee. Akbar had never served on a fairness committee before.

On Saturday morning, the draft materials sent to the fairness committee contained the following analyses:

- six comparable companies ranges based on a single reference company, Air Methods Corp., that was in a different business (air transport) than Rural (ground transport);

- two precedent transaction ranges using multiples of 7.5x to 9.5x, with one range of $15.49 to $21.91 based on management pro forma adjusted EBITDA for 2010, and a second range of $13.31 to $19.15 based on "consensus" adjusted EBITDA for 2010, which assumed that Wall Street analysts would add back $6.3 million for certain one-time expenses; and

- a DCF range of $16.49 to $21.35 based on a WACC of 12.3% to 13.3% and an EBITDA exit multiple of 7.0x to 8.0x.

Setting aside the comparable company analysis, the ranges suggested that the deal price fell at the midpoint of fairness. By the end of the day, the metrics would make the deal look more attractive.[1]

Munoz, Daniel, and the two-person *ad hoc* committee made a series of decisions about the analyses. The first decision was not to rely on the single comparable company for valuation purposes. RBC nevertheless left the analysis in the materials, although it did remove it from the valuation football field.

The next decision was to change the precedent transaction analysis. RBC decided to use three precedents: (i) CD & R's recent acquisition of EMS at 9.5x EBITDA; (ii) Bain Capital's recent acquisition of Air Medical at 9.4x EBITDA; and (iii) AMR's acquisition of EMS *in 2004* at 6.3x EBITDA. In its December 2010 pitch book and in the morning draft, RBC gave the seven-year-old comparable limited importance. The *ad hoc* fairness committee decided to give full credit to the 2004 comparable as a proxy for Rural's value in 2011. As a result, the committee lowered the low end multiple from 7.5x to 6.3x. This change was inconsistent with RBC's December 2010 pitch book, where RBC assigned AMR a low-end multiple of 8.0x and suggested that Rural pay 8.4x for AMR. This change also was inconsistent with RBC's view, expressed throughout the sale process, that Rural's operating metrics were objectively superior to AMR's (which they were). The adjustment lowered the bottom end of the management case precedent transaction range

1. Moelis also made debatable changes to its valuation materials that had the effect of lowering the range of fairness and making the merger price look more attractive. Because Moelis settled with the plaintiffs, this decision does not delve into the minutiae of Moelis's work, and it does not make any findings as to why Moelis made the changes.

from $15.49 per share to $11.54 per share. The other two precedent transactions implied a value for Rural in excess of $21 per share.

Another change was to lower the "consensus" adjusted EBITDA for 2010 from $76.5 million to $69.8 million. RBC primarily accomplished this by deciding not to make any adjustments for $6.3 million in one-time expenses. RBC's December 2010 pitch book and materials prepared for meetings on February 6, 2011, and March 15, 2011, had adjusted 2010 EBITDA for one-time expenses. In an email, Munoz noted that RBC would "need to add some bullets that say Wall Street analyst [sic] do not reflect any of these one-time expenses. Something to explain why we are not adjusting." JX 529. The final product stated that "consensus" 2010 EBITDA was $69.8 million, with the explanation "Wall Street research analysts covering [Rural] do not make pro forma adjustments." JX 548 at 15. This statement was false. The Wall Street research analysts covering Rural in fact accounted for and added back one-time expenses. The "consensus" range also did not reflect $1.6 million in projected annual earnings from the Pridemark acquisition and another $5.4 million in projected annual earnings from the Santa Clara County contract.

The combined effect of lowering "consensus" adjusted EBITDA by $6.7 million and lowering the low-end multiple from 7.5x to 6.3x was dramatic. On Saturday morning, the "consensus" precedent transaction range was $13.31 to $19.15. On Saturday afternoon, it was $8.19 to $16.71, entirely below the deal price.

RBC's DCF analysis showed a range of $16.28 to $21.07, with a base case price of $18.73. RBC used an exit multiple range of 7.0x to 8.0x, which did not match up with the range used for RBC's precedent transaction analysis. On February 8,

2011, RBC had provided to DiMino an LBO analysis with an exit multiple range of 7.8x to 8.3x. If the bottom of the exit multiple range was 7.5x (the original bottom of the precedent transaction ranges), then the bottom of the DCF range would be $18.00, above the deal price. When Munoz saw the DCF range, he commented, "I thought we were going to try to reduce dcf?" JX 529.

During the afternoon of March 26, Munoz let Fleming know that Warburg was still refusing to include RBC on the financing side. Fleming responded, "I'm gonna call [W]arburg myself. We just committed 65 to their effing revolver." JX 525. When he asked Munoz for a further update, Munoz wrote, "Not on email." *Id.*

The next day, RBC's deal team submitted a revised version of the fairness presentation to the *ad hoc* committee. Morton approved the revised version without reading it. JX 553. Akbar asked one question and signed off. *Id.*

On the financing side, Munoz and Fleming lamented their inability to get onto Warburg's tree. Their email exchange went as follows:

> Munoz: I am the rbc guinea pig. Never easy[.]
>
> Fleming: Yep. Amazing. I have to go see [W]arburg this week. I just pushed 65 revolver through.
>
> Munoz: Lets [sic] make sure all rbc bankers know they owe us big time. Should be first page of all pitch books.
>
> Fleming: Our revolver in rural is gonna be very very small.

JX 539. The revolver commitment would end up being $5 million. JX 601.

## L. The Board Approves The Merger.

On March 27, 2011, the directors convened a joint meeting of the Board and the Special Committee. The Board meeting

started at 11:00 p.m. Eastern time on Sunday, March 27. The directors received written valuation analyses from RBC and Moelis at 9:42 p.m. Eastern time. This was the first valuation information that the Board ever received as part of the sale process. The merger agreement was approved after midnight.

Warburg was thrilled with the deal. One of Carney's partners wrote him, "Congrats on getting the deal closed. Couldn't be more in WP's sweet spot—market leader, good organic growth, acquisition opportunities, $200mm equity check, limited downside. Wish we could do these types of deals all day long!" JX 564. A Warburg investment memorandum summarized their perspective on the sale process:

> The [Rural] process was competitive and included a number of private equity firms, but **the concurrent timing of the EMS process created a unique competitive dynamic.** [Rural] excluded firms from its process who were still involved in evaluating EMS, so some of the more typical competitors in healthcare service transactions did not participate in the auction. **We were fortunate in having withdrawn from the EMS process in the first round and thus were able to pursue [Rural] aggressively.** We worked closely with a team of experienced consultants and advisors to conduct extensive due diligence on [Rural], which gave us comfort in the Company's upside potential and limited downside risk. We also built a strong relationship with management through the auction process, enabling us to develop conviction in our ability to partner with them successfully. Finally, our fund size was significantly larger than the other private equity firms in the process, so we were able to underwrite a more aggressive acquisition case because of our ability to invest additional

equity capital following the initial transaction.

JX 628 at 9–10 (emphasis added).

RBC continued to regret not getting the buy-side financing role. Fleming wrote Munoz, "Well congrats anyways! We'll find a way to lever Warburg ... I'm seeing them this week." JX 570.

## M. This Litigation

The public announcement of the merger prompted suits by firms who specialize in stockholder representative litigation. Two stockholders filed suit on April 6, 2011: Beatriz Llorens in Delaware and current lead plaintiff Joanna Jervis in Arizona.

After the court consolidated the actions and appointed Llorens as lead plaintiff, the defendants and Llorens entered into a Memorandum of Understanding ("MOU") to settle the Delaware action for supplemental disclosures and the defendants' agreement not to oppose a fee application. Rural's stockholders approved the merger. Out of the 25.4 million shares outstanding, 18.3 million (72%) voted in favor.

The court conducted a hearing on the fairness of the settlement on January 17, 2012. Jervis objected to the settlement, arguing that the evidence obtained during pre-MOU expedited discovery and in post-MOU confirmatory discovery revealed conflicts of interest. The disclosure-only settlement was rejected as inadequate, and Jervis's counsel took over the case. Jervis then filed an amended complaint that added claims against Moelis and RBC. She currently represents a class of plaintiffs comprising the holders of Rural's publicly traded shares other than the directors, Moelis, RBC, and their affiliates. Shortly before trial, the directors settled for $6.6 million, and Moelis settled for $5 million. The plaintiffs proceeded to trial against RBC.

## II. LEGAL ANALYSIS

■ The plaintiffs seek damages from RBC for aiding and abetting breaches of fiduciary duty. This claim has four elements: (i) the existence of a fiduciary relationship, (ii) a breach of the fiduciary's duty, (iii) knowing participation in the breach by the non-fiduciary defendants, and (iv) damages proximately caused by the breach. *Malpiede v. Townson*, 780 A.2d 1075, 1096 (Del.2001). The attacks on RBC fall under two broad headings: (i) misconduct leading to breaches of duty during the sale process and (ii) misconduct leading to disclosure violations.

### A. The Sale Process Claim

The plaintiffs contend that RBC induced the Board to breach its fiduciary duties during the sale process. The plaintiffs raise a series of challenges to the actions that RBC and the Board took between December 2010 and March 2011. The plaintiffs proved a subset of their sale process claims.

### 1. The Existence Of A Fiduciary Relationship

■ The first element of a sale process claim for aiding and abetting is readily satisfied. The individual defendants were directors of a Delaware corporation. In that capacity, they were fiduciaries who owed duties of loyalty and care. *See Stone ex rel. AmSouth Bancorporation v. Ritter*, 911 A.2d 362, 370 (Del.2006). Judicial decisions often describe those duties as running "to the corporation and its shareholders."[2] "This formulation captures the foundational relationship in which directors owe duties to the corporation for the ultimate benefit of the entity's residual claimants." *In re Trados Inc. S'holder Litig. (Trados II )*, 73 A.3d 17, 36–37 (Del. Ch.2013).

■ In substance, the directors' fiduciary duties require that they seek "to promote the value of the corporation for the benefit of its stockholders."[3] "[S]tockholders' best interest must always, within legal limits, be the end. Other [corporate] constituencies may be considered only instrumentally to advance that end." Leo E. Strine, Jr., *Our Continuing Struggle with the Idea that For–Profit Corporations Seek Profit*, 47 Wake Forest L.Rev. 135, 147 n. 34 (2012). More concretely, the fiduciary relationship between the Board and Rural's stockholders required that the directors act prudently, loyally, and in good faith to maximize Rural's value over the long-term for the benefit of its stockholders.[4] In considering whether to pursue

2. *N. Am. Catholic Educ. Programming Found., Inc. v. Gheewalla*, 930 A.2d 92, 99 (Del.2007); *accord Mills Acq. Co. v. Macmillan, Inc.*, 559 A.2d 1261, 1280 (Del.1989) ("[D]irectors owe fiduciary duties of care and loyalty to the corporation and its shareholders...."); *Polk v. Good*, 507 A.2d 531, 536 (Del.1986) ("In performing their duties the directors owe fundamental fiduciary duties of loyalty and care to the corporation and its shareholders.").

3. *eBay Domestic Hldgs., Inc. v. Newmark*, 16 A.3d 1, 34 (Del.Ch.2010); *accord Gheewalla*, 930 A.2d at 101 ("The directors of Delaware corporations have 'the legal responsibility to manage the business of a corporation for the benefit of its shareholder[ ] owners.' "); *Uno-*

*cal Corp. v. Mesa Petroleum Co.*, 493 A.2d 946, 955 (Del.1985) (citing "the basic principle that corporate directors have a fiduciary duty to act in the best interests of the corporation's stockholders"); *see also* Leo E. Strine, Jr., et al., *Loyalty's Core Demand: The Defining Role of Good Faith in Corporation Law*, 98 Geo. L.J. 629, 634 (2010) ("[I]t is essential that directors take their responsibilities seriously by actually trying to manage the corporation in a manner advantageous to the stockholders.").

4. *See, e.g., Gantler v. Stephens*, 965 A.2d 695, 706 (Del.2009) (holding that "enhancing the corporation's long term share value" is a "distinctively corporate concern[ ]"); *TW*

a strategic alternative that would end or fundamentally alter the stockholders' ongoing investment in Rural, this relationship required that the directors seek an alternative that would yield value "exceeding what the corporation otherwise would generate for stockholders over the long-term." [5]

### 2. The Predicate Breach Of Fiduciary Duty

▇▇▇ When determining whether corporate fiduciaries have breached their duties, Delaware corporate law distin-

guishes between the standard of conduct and the standard of review.[6] "The standard of conduct describes what directors are expected to do and is defined by the content of the duties of loyalty and care. The standard of review is the test that a court applies when evaluating whether directors have met the standard of conduct." *Trados II*, 73 A.3d at 35–36. The description of the fiduciary relationship in the preceding section describes a standard of conduct, not the standard of review.

▇▇▇ "Delaware has three tiers of review for evaluating director decision-mak-

Servs., Inc. v. SWT Acq. Corp., 1989 WL 20290, at *7 (Del.Ch. Mar. 2, 1989) (Allen, C.) (describing as "non-controversial" the proposition that "the interests of the shareholders as a class are seen as congruent with those of the corporation in the long run" and explaining that "[t]hus, broadly, directors may be said to owe a duty to shareholders as a class to manage the corporation within the law, with due care and in a way intended to maximize the long run interests of shareholders"); Andrew A. Schwartz, *The Perpetual Corporation*, 80 Geo. Wash. L.Rev. 764, 777–83 (2012) (arguing that the corporate attribute of perpetual existence calls for a fiduciary mandate of long-term value maximization for the stockholders' benefit); William T. Allen, *Ambiguity in Corporation Law*, 22 Del. J. Corp. L. 894, 896–97 (1997) ("[I]t can be seen that the proper orientation of corporation law is the protection of long-term value of capital committed indefinitely to the firm.").

5. *Trados II*, 73 A.3d at 37; *compare Paramount Commc'ns Inc. v. QVC Network Inc. ("QVC")*, 637 A.2d 34, 43 (Del.1994) (holding it was reasonably probable that directors breached their fiduciary duties by pursuing ostensibly superior value to be created by long-term strategic combination when, post-transaction, a controller would have "the power to alter that vision," rendering its value highly contingent), *and Revlon, Inc. v. MacAndrews & Forbes Hldgs., Inc.*, 506 A.2d 173, 182 (Del.1986) (holding that alternative of maintaining corporation as stand-alone entity and use of defensive measures to preserve that alternative "became moot" once board determined that values achievable through a

sale process exceeded board's assessment of stand-alone value), *with Paramount Commc'ns, Inc. v. Time Inc.*, 571 A.2d 1140, 1154 (Del.1989) (holding it was not reasonably probable that directors breached their fiduciary duties by pursuing superior long-term value of strategic, stock-for-stock merger without a post-transaction controller), *Unocal*, 493 A.2d at 956 (holding it was not reasonably probable that directors breached their fiduciary duties by adopting a selective exchange offer to defend against a two-tiered tender offer where blended value of offer was less than $54 per share and board reasonably believed stand-alone value of corporation was much greater), *and Air Prods. & Chems., Inc. v. Airgas, Inc.*, 16 A.3d 48, 112 (Del.Ch.2011) (holding that board complied with fiduciary duties by maintaining a rights plan to protect higher stand-alone value of corporation rather than permit immediate sale).

6. For a discussion of the distinction in Delaware law between the standard of conduct and the standard of review, see William T. Allen, Jack B. Jacobs, & Leo E. Strine, Jr., *Realigning the Standard of Review of Director Due Care with Delaware Public Policy: A Critique of Van Gorkom and its Progeny as a Standard of Review Problem*, 96 Nw. U.L.Rev. 449, 451–52 (2002). For academic treatments, see Melvin Aron Eisenberg, *The Divergence of Standards of Conduct and Standards of Review in Corporate Law*, 62 Fordham L.Rev. 437, 461–67 (1993), and Julian Velasco, *The Role of Aspiration in Corporate Fiduciary Duties*, 54 Wm. & Mary L.Rev. 519, 553–58 (2012).

ing: the business judgment rule, enhanced scrutiny, and entire fairness." *Reis v. Hazelett Strip–Casting Corp.*, 28 A.3d 442, 457 (Del.Ch.2011). "Enhanced scrutiny is Delaware's intermediate standard of review." *Trados II*, 73 A.3d at 43. It applies to "specific, recurring, and readily identifiable situations involving potential conflicts of interest where the realities of the decisionmaking context can subtly undermine the decisions of even independent and disinterested directors."[7] Inherent in these situations are subtle structural and situational conflicts that do not rise to a level sufficient to trigger entire fairness review, but also do not comfortably permit expansive judicial deference.[8] Framed generally, enhanced scrutiny requires that the defendant fiduciaries "bear the burden of persuasion to show that their motivations were proper and not selfish" and that "their actions were reasonable in relation to their legitimate objective." *Mercier v. Inter–Tel (Del.), Inc.*, 929 A.2d 786, 810 (Del.Ch.2007).

The Delaware Supreme Court created the intermediate standard of review in its iconic *Unocal* decision, which declined to apply either the business judgment rule or the entire fairness test to actions taken by directors to resist a hostile takeover. The Delaware Supreme Court recognized that in such a setting, there is an "omnipresent specter" that even nominally disinterested and independent directors may be influenced by and act to further their own interests or those of incumbent management, "rather than those of the corporation and its shareholders." *Unocal*, 493 A.2d at 954. To address this subtle conflict, the Delaware Supreme Court held that the target directors would have the burden of showing that (i) "they had reasonable grounds for believing that a danger to corporate policy and effectiveness existed," and (ii) the response they selected was "reasonable in relation to the threat posed." *Id.* at 955.

One year later, in *Revlon*, the Delaware Supreme Court held that its then-new intermediate standard would apply to the sale of a corporation for cash. 506 A.2d at 180–82. Enhanced scrutiny applies in that context because of the potential conflicts of interest that fiduciaries

---

7. *Id.; accord Reis*, 28 A.3d at 457–59; *see QVC*, 637 A.2d at 42 ("[T]here are rare situations which mandate that a court take a more direct and active role in overseeing the decisions made and actions taken by directors. In these situations, a court subjects the directors' conduct to enhanced scrutiny to ensure that it is reasonable."); *In re Dollar Thrifty S'holder Litig.*, 14 A.3d 573, 598 (Del. Ch.2010) ("In a situation where heightened scrutiny applies, the predicate question of what the board's true motivation was comes into play. The court must take a nuanced and realistic look at the possibility that personal interests short of pure self-dealing have influenced the board to block a bid or to steer a deal to one bidder rather than another.").

8. *See Dollar Thrifty*, 14 A.3d at 597 ("Avoiding a crude bifurcation of the world into two starkly divergent categories—business judgment rule review reflecting a policy of maximal deference to disinterested board decision-making and entire fairness review reflecting a policy of extreme skepticism toward self-dealing decisions—the Delaware Supreme Court's *Unocal* and *Revlon* decisions adopted a middle ground."); *Golden Cycle, LLC v. Allan*, 1998 WL 892631, at *11 (Del.Ch. Dec. 10, 1998) (locating enhanced scrutiny under *Unocal* and *Revlon* between the business judgment rule and the entire fairness test); Stephen M. Bainbridge, *Unocal at 20: Director Primacy in Corporate Takeovers*, 31 Del. J. Corp. L. 769, 795–96 (2006) (explaining Delaware Supreme Court's decision to create an intermediate standard of review between the entire fairness and business judgment rule standards); Ronald J. Gilson, *Unocal Fifteen Years Later (And What We Can Do About It)*, 26 Del. J. Corp. L. 491, 496 (2001) ("In *Unocal*, the Delaware Supreme Court chose the middle ground that had been championed by no one. The court unveiled an intermediate standard of review....").

face when considering whether to sell the corporation, to whom, and on what terms.[9] Tailored for this scenario, the defendant fiduciaries bear the burden of proving that they "act[ed] reasonably to seek the transaction offering the best value reasonably available to the stockholders," which could be remaining independent and not engaging in any transaction at all. *QVC*, 637 A.2d at 43.

■■■■ To satisfy the enhanced scrutiny test in the M & A context, the defendant directors must establish both (i) the reasonableness of "the decisionmaking process employed by the directors, including the information on which the directors based their decision," and (ii) "the reasonableness of the directors' action in light of the circumstances then existing." *Id.* at 45. "Through this examination, the court seeks to assure itself that the board acted reasonably, in the sense of taking a logical and reasoned approach for the purpose of advancing a proper objective, and to thereby smoke out mere pretextual justifications for improperly motivated decisions." *Dollar Thrifty*, 14 A.3d at 598. Because the directors' motivations are at issue, "*Revlon* and *Unocal* and the duties of a Board when faced with a contest for corporate control do not admit of easy categorization as duties of care or loyalty." *In re Santa Fe Pac. Corp. S'holder Litig.*, 669 A.2d 59, 67 (Del.1995).

9. *See, e.g., In re El Paso Corp. S'holder Litig.*, 41 A.3d 432, 439 (Del.Ch.2012) ("[T]he potential sale of a corporation has enormous implications for corporate managers and advisors, and a range of human motivations, including but by no means limited to greed, can inspire fiduciaries and their advisors to be less than faithful."); *Dollar Thrifty*, 14 A.3d at 597 ("The heightened scrutiny that applies in the *Revlon* (and *Unocal*) contexts are, in large measure, rooted in a concern that the board might harbor personal motivations in the sale context that differ from what is best for the corporation and its stockholders."). As scholars frequently have observed, these conflicts of interest arise because "[a] negotiated corporate acquisition is a paradigmatic example of a final period problem." Bainbridge, *supra*, at 788–89; *accord* Bernard Black & Reinier Kraakman, *Delaware's Takeover Law: The Uncertain Search for Hidden Value*, 96 Nw. U.L.Rev. 521, 536 (2002) (describing negotiated acquisition as a scenario in which "the target's managers and board will likely lose their positions. They face a strong conflict of interest, yet they are in a final period where reputation and fear of future discipline lose their force as constraints on self-interested behavior."); Ronald J. Gilson & Reinier Kraakman, *What Triggers* Revlon?, 25 Wake Forest L.Rev. 37, 54 (1990) ("A friendly merger in which the ownership of a constituent company remains diffuse but de facto control shifts from one management team to another, is no less a control shift than a transaction that gives rise to a control block.... [T]he

absence of [a controller] ... does not reduce the danger that [stockholder] interests will suffer under the merger terms negotiated by their own management."); Sean J. Griffith, *The Costs and Benefits of Precommitment: An Appraisal of Omnicare v. NCS Healthcare*, 29 J. Corp. L. 569, 616 (2004) ("Acquisitions create a last period scenario for target managers and directors because the reorganization of the corporate structure following the transaction is likely either to end their tenure or, at the very least, significantly change their role in the company."); Sean J. Griffith, *Deal Protection Provisions in the Last Period of Play*, 71 Fordham L.Rev. 1899, 1945 (2003) ("Although the drama and hyperbole of a bust up acquisition is typically not present in the context of a 'friendly' merger—after all, the business continues to operate and many employees keep their jobs—last period features are still present at the level of the board of directors and senior management, many of whom are likely to be in the last period of their employment."). *See generally* J. Travis Laster, *Omnicare's Silver Lining*, 38 J. Corp. L. 795, 804–11 (2013) (discussing final period problem and resulting situational conflicts as justification for the Delaware Supreme Court's much-debated ruling in *Omnicare, Inc. v. NCS Healthcare, Inc.*, 818 A.2d 914 (Del.2003)); J. Travis Laster, Revlon *is a Standard of Review: Why It's True and What It Means*, 19 Fordham J. Corp. & Fin. L. 5, 8–18 (2013) (discussing final period problem and implications of situational conflicts for *Revlon* as a standard of review).

"The reasonableness standard permits a reviewing court to address inequitable action even when directors may have subjectively believed that they were acting properly." *In re Del Monte Foods Co. S'holders Litig.*, 25 A.3d 813, 830–31 (Del.Ch.2011). The objective standard does not, however, permit a reviewing court to freely substitute its own judgment for the directors':

> There are many business and financial considerations implicated in investigating and selecting the best value reasonably available. The board of directors is the corporate decisionmaking body best equipped to make these judgments. Accordingly, a court applying enhanced judicial scrutiny should be deciding whether the directors made a reasonable decision, not a perfect decision. If a board selected one of several reasonable alternatives, a court should not second-guess that choice even though it might have decided otherwise or subsequent events may have cast doubt on the board's determination. Thus, courts will not substitute their business judgment for that of the directors, but will determine if the directors' decision was, on balance, within a range of reasonableness.

*QVC*, 637 A.2d at 45. Enhanced scrutiny "is not a license for law-trained courts to second-guess reasonable, but debatable, tactical choices that directors have made in good faith." *In re Toys "R" Us, Inc. S'holder Litig.*, 877 A.2d 975, 1000 (Del.Ch. 2005); *accord Dollar Thrifty*, 14 A.3d at 595–96 ("[A]t bottom Revlon is a test of reasonableness; directors are generally free to select the path to value maximization, so long as they choose a reasonable route to get there."). "What typically drives a finding of unreasonableness is evidence of self-interest, undue favoritism or disdain towards a particular bidder, or a similar non-stockholder-motivated influence that calls into question the integrity of the process." *Del Monte*, 25 A.3d at 831.

In this case, the Board approved a sale of Rural to Warburg for cash. This transactional context causes the standard of review to intensify from the business judgment rule to enhanced scrutiny.[10] But unlike in a typical breach of fiduciary duty case, the plaintiffs bore the burden of proving conduct falling outside the range of reasonableness. As noted, when a stockholder plaintiff sues defendant directors for allegedly breaching their fidu-

---

10. Because the Proxy Statement contained materially misleading disclosures and omissions, this case does not provide any opportunity to consider whether a fully informed stockholder vote would lower the standard of review from enhanced scrutiny to the business judgment rule. *See In re Morton's Rest. Gp., Inc. S'holders Litig.*, 74 A.3d 656, 663 n. 34 (Del.Ch.2013) ("[I]t is plain that, when disinterested approval of a sale to an arm's-length buyer is given by a majority of stockholders who have had the chance to consider whether or not to approve a transaction for themselves, there is a long and sensible tradition of giving deference to the stockholders' voluntary decision, invoking the business judgment rule standard of review, and limiting any challenges to the difficult argument that the transaction constituted waste."); *In re S. Peru Copper Corp. S'holder Deriv. Litig.*, 52 A.3d 761, 793 n. 113 (Del.Ch.2011) (expressing the view that in the absence of a majority stockholder or *de facto* controller, "the approval of an uncoerced, disinterested electorate of a merger (including a sale) would have the effect of invoking the business judgment rule standard of review"), *aff'd sub nom. Ams. Mining Corp. v. Theriault*, 51 A.3d 1213 (Del.2012); *In re PNB Hldg. Co. S'holders Litig.*, 2006 WL 2403999, at *14 (Del.Ch. Aug. 18, 2006) ("[O]utside the *Lynch* context, proof that an informed, non-coerced majority of the disinterested stockholders approved an interested transaction has the effect of invoking business judgment rule protection for the transaction and, as a practical matter, insulating the transaction from revocation and its proponents from liability.").

ciary duties in connection with a decision that is subject to enhanced scrutiny, the burden of proof shifts to the defendant fiduciaries to satisfy its requirements. For an aiding and abetting claim, however, the burden of proof rests with the plaintiffs.[11] If the Rural directors had stayed in the case and failed to carry their burden of proof, then that outcome would govern the element of fiduciary breach for the aiding and abetting claim. By choosing to settle with the directors and continue only with the aiding and abetting claim, the plaintiffs took up the burden of proof on each of the elements of aiding and abetting, including the existence of a fiduciary breach.

### 3. The Irrelevance Of An Exculpatory Provision To The Element Of Fiduciary Breach

As authorized by Section 102(b)(7) of the Delaware General Corporation Law (the "DGCL"), Rural has an exculpatory provision in its certificate of incorporation. If this case involved questions of individual director liability, rather than only the predicate question of a fiduciary breach, then Rural's exculpatory provision would have a significant role in the analysis. Like the entire fairness test, enhanced scrutiny is a standard of review designed to assess whether a transaction "should be respected or set aside in equity." *Venhill Ltd. P'ship ex rel. Stallkamp v. Hillman*, 2008 WL 2270488, at *22 (Del. Ch. June 3, 2008) (making this observation

regarding the entire fairness test). A failure to satisfy the enhanced scrutiny standard, like a failure to satisfy the entire fairness test, establishes the existence of a breach of duty, but that fact "has only a crude and potentially misleading relationship to the liability any particular fiduciary has for involvement in" the challenged decision. *Id.* (same). Affirmative defenses, most commonly the existence of an exculpatory provision authorized by Section 102(b)(7) of the DGCL, may result in a director not being held liable despite having been found wanting under the applicable standard of review. "[T]he presence of the exculpatory charter provision would require an examination of [each director's] state of mind, in order to determine whether they breached their duty of loyalty...." *Id.* at *23 (same). "If those directors acted in the good faith belief that they were pursuing the corporation's best interests—that is, with a loyal state of mind—their failure" to achieve a result falling within the range of reasonableness does not expose them to liability, "because the charter provision immunized them from liability for mere violations of the duty of care." *Id.* (same).

The presence of an exculpatory provision does not eliminate the underlying duty of care or the potential for fiduciaries to breach that duty. *Malpiede*, 780 A.2d at 1095 n. 68; *In re Walt Disney Co. Deriv. Litig.*, 907 A.2d 693, 752 (Del.Ch. 2005), *aff'd*, 906 A.2d 27 (Del.2006). Con-

---

11. *See Zimmerman v. Crothall*, 62 A.3d 676, 712 (Del.Ch.2013) ("To succeed on a claim for aiding and abetting a breach of fiduciary duty, Plaintiff must prove: (1) the existence of a fiduciary relationship, (2) a breach of the fiduciary's duty, and (3) knowing participation in that breach by the non-fiduciary."); *Triton Constr. Co. v. E. Shore Elec. Servs., Inc.*, 2009 WL 1387115, at *16 (Del.Ch. May 18, 2009) (evaluating whether plaintiff carried burden of proof at trial on each element of

aiding and abetting claim), *aff'd*, 988 A.2d 938 (Del.2010) (TABLE); *Allied Capital Corp. v. GC–Sun Hldgs., L.P.*, 910 A.2d 1020, 1039 (Del.Ch.2006) ("[T]he test for stating an aiding and abetting claim is a stringent one ...— a plaintiff must prove [its elements]"); *Arnold v. Soc'y for Sav. Bancorp, Inc. (Arnold III)*, 1995 WL 376919, at *7 (Del.Ch. June 15, 1995) ("Plaintiff must prove his aider and abettor theory to hold BoB liable...."), *aff'd*, 678 A.2d 533 (Del.1996).

sequently, "[t]he duty of care continues to have vitality in remedial contexts as opposed to actions for personal monetary damages against directors as individuals." E. Norman Veasey et al., *Delaware Supports Directors With a Three–Legged Stool of Limited Liability, Indemnification, and Insurance*, 42 Bus. Law. 399, 403 (1987).

Depending on the facts of the case, it may be possible for a court to rule on an affirmative defense before reaching the question of breach. For example, depending on the facts alleged, the standard of review, and the procedural stage, a court may be able to determine that a plaintiff's claims only implicate breaches of the duty of care and apply an exculpatory provision to enter judgment in favor of defendant directors without making a predicate finding of a breach of fiduciary duty.[12] Such a ruling does not equate to an implicit finding that the directors did not breach their duties. Directors whose actions fail to

pass muster under the applicable standard of review have breached their fiduciary duties, even though they are not liable for damages when exculpation applies. 8 *Del. C.* § 102(b)(7).[13]

■ RBC has argued that the exculpatory provision in Rural's certificate of incorporation should apply equally to a party charged with aiding and abetting a breach of fiduciary duty. That is not what Section 102(b)(7) authorizes. The literal language of Section 102(b)(7) only covers directors; it does not extend to aiders and abettors. 8 *Del. C.* § 102(b)(7) (authorizing "a provision eliminating or limiting the personal liability of a director to the corporation or its stockholders for monetary damages for breach of fiduciary duty as a director"); *Del Monte*, 25 A.3d at 838 ("By their terms, Sections 102(b)(7) and 141(e) do not protect aiders and abetters. . . ."). For similar textual reasons, the Delaware

---

**12.** *Compare Emerald P'rs v. Berlin (Emerald I)*, 726 A.2d 1215, 1223 (Del.1999) (holding that in challenge to transaction with majority stockholder to which entire fairness applied, court could not apply Section 102(b)(7) on motion for summary judgment because factual conflicts required a trial to determine nature of the duty breached), *with Malpiede*, 780 A.2d at 1094–96 (holding that in challenge to third-party, arm's-length merger that was approved by fully informed stockholder vote, court could apply Section 102(b)(7) at pleadings stage unless plaintiff pled facts sufficient to show that a majority of the board was not disinterested or independent), *with Emerald P'rs v. Berlin (Emerald II)*, 787 A.2d 85, 93–94 (Del.2001) (holding that in challenge to transaction with majority stockholder to which entire fairness applied, court could not apply Section 102(b)(7) post trial without first analyzing transaction under entire fairness standard to determine nature of the fiduciary breach), *with Lyondell Chem. Co. v. Ryan*, 970 A.2d 235, 237, 244 (Del.2009) (holding that in challenge to third-party, arm's-length merger, court could apply Section 102(b)(7) at summary judgment stage where plaintiffs/appellees claimed that directors "consciously disre-

garded their fiduciary duties" yet evidence showed that directors had not "utterly failed to attempt to obtain the best sale price"). *See generally* 1 David A. Drexler et al., Delaware Corporation Law and Practice, § 6.02[7] at 6–21 (2013).

**13.** Along similar lines, if the directors followed a process or reached a result falling outside the range of reasonableness, but did so in reliance on the advice of experts, they could be found to have breached their fiduciary duties under the applicable standard of review and yet be "fully protected" against liability under Section 141(e) of the DGCL. 8 *Del. C.* § 141(e); *see Valeant Pharm. Int'l v. Jerney*, 2007 WL 2813789, at *14 (Del.Ch. Mar. 1, 2007) (holding that availability of Section 141(e) defense to liability is not outcome-determinative on question of breach of duty under entire fairness test); *Boyer v. Wilm. Materials, Inc.*, 754 A.2d 881, 910 (Del. Ch.1999) (distinguishing between reliance on advisors as a factor in evaluating procedural fairness and a Section 141(e) defense); *Cinerama, Inc. v. Technicolor, Inc.*, 663 A.2d 1134, 1142 (Del.Ch.1994) (Allen, C.) (same), *aff'd*, 663 A.2d 1156 (Del.1995).

Supreme Court has noted that Section 102(b)(7) does not protect officers. *See Gantler*, 965 A.2d at 709 n. 37 ("Although legislatively possible, there currently is no statutory provision authorizing comparable exculpation of corporate officers.").

Consistent with the plain language of the statute, decisions in litigation involving the acquisition of Society for Savings Bancorp, Inc. indicate that Section 102(b)(7) does not extend to an aider and abettor. In that lawsuit, the Court of Chancery initially granted summary judgment in favor of the defendant directors. *Arnold v. Soc'y for Sav. Bancorp, Inc. (Arnold I)*, 1993 WL 526781 (Del.Ch. Dec. 17, 1993), *rev'd* 650 A.2d 1270 (Del.1994). The Delaware Supreme Court reversed, holding that the sell-side directors made materially misleading partial disclosures in the proxy statement issued in connection with the vote on the merger. *Arnold v. Soc'y for Sav. Bancorp, Inc. (Arnold II)*, 650 A.2d 1270, 1290 (Del.1994). The Supreme Court also determined that an exculpatory provision shielded the directors from liability because their breaches only involved the duty of care. *Id.* On remand, the Court of Chancery held that the plaintiffs could not proceed against the directors under any theory, but they could maintain a claim against the acquirer for aiding and abetting the breach of the duty of care that resulted in the misleading disclosures, notwithstanding that the defendant directors were protected by an exculpatory provision. *Arnold III*, 1995 WL 376919, at *8. The Delaware Supreme Court affirmed this ruling. *See Arnold v. Soc'y for Sav. Bancorp, Inc. (Arnold IV)*, 678 A.2d 533, 541–542 (Del.1996). If the shield of Section 102(b)(7) extended to an aider and abettor, then *Arnold III* and *Arnold IV* should have come out the opposite way.

■ When the plain language of a statute produces a rational result, a court's task is to apply the statute as written. *CML V, LLC v. Bax*, 28 A.3d 1037, 1041 (Del.2011). There are sound reasons why the General Assembly could have decided rationally to authorize exculpation for independent, disinterested directors who act in good faith, but not to extend exculpation to the highly compensated advisors on whom the directors are entitled (and encouraged) to rely. *See* 8 *Del. C.* § 141(e).

Like the business judgment rule, Section 102(b)(7) promotes stockholder interests by ensuring that directors do not become overly risk-averse:

> Corporate directors of public companies typically have a very small proportionate ownership interest in their corporations and little or no incentive compensation. Thus, they enjoy (as residual owners) only a very small proportion of any "upside" gains earned by the corporation on risky investment projects. If, however, corporate directors were to be found liable for a corporate loss from a risky project on the ground that the investment was too risky (foolishly risky! stupidly risky! egregiously risky!—you supply the adverb), their liability would be joint and several for the whole loss (with I suppose a right of contribution). Given the scale of operation of modern public corporations, this stupefying disjunction between risk and reward for corporate directors threatens undesirable effects. Given this disjunction, only a very small probability of director liability based on "negligence", "inattention", "waste", etc., could induce a board to avoid authorizing risky investment projects to any extent! Obviously, it is in the shareholders' economic interest to offer sufficient protection to directors from liability for negligence, etc., to allow directors to conclude that, as a practical matter, there is no risk that, if they act in good faith and meet minimal pro-

ceduralist standards of attention, they can face liability as a result of a business loss.

*Gagliardi v. TriFoods Int'l, Inc.*, 683 A.2d 1049, 1052 (Del.Ch.1996) (Allen, C.). In this case, the plaintiffs are not seeking to recover an award of money damages from disinterested, independent directors whose potential exposure otherwise could dwarf their director fees and equity upside. The plaintiffs are pursuing a highly compensated advisor that hoped to generate $60 million in fees by inducing the Board to sell Rural when and in the manner it did.

Directors are not expected to have the expertise to determine a corporation's value for themselves, or to have the time or ability to design and carry out a sale process. Financial advisors provide these expert services. In doing so, they function as gatekeepers.[14]

The term "gatekeeper" has been widely used to refer to the outside professionals who serve the board or investors. Broadly as the term may be sometimes used, two core elements underlie the concept of gatekeeper, and it is important to distinguish between them. First, the gatekeeper is a person who has significant reputational capital, acquired over many years and many clients, which it pledges to assure the accuracy of statements or representations that it either makes or verifies. Second, the gatekeeper receives a far smaller benefit or payoff for its role, as an agent, in approving, certifying, or verifying information than does the principal from the transaction that the gatekeeper facilitates or enables.... Thus, because of this lesser benefit, the gatekeeper is easier to deter. This latter premise applies even if the gatekeeper has little or no reputational capital. These two elements—that the gatekeeper is a reputational intermediary and that it receives only a limited payoff from any involvement in misconduct—suggest a strategy for law compliance: the more the law makes the involvement of gatekeepers in sensitive transactions mandatory, the more it acquires a lever by which it can effectively discourage law violations.

*Gatekeeper Failure and Reform, supra,* at 308. "Obvious examples of gatekeepers who provide such verification or certification services would include ... the investment banker providing its 'fairness opinion' as to the pricing of a merger." *Id.* at 309.

The threat of liability helps incentivize gatekeepers to provide sound advice, monitor clients, and deter client wrongs.[15]

---

**14.** A substantial literature exists on corporate gatekeepers. *See, e.g.,* John C. Coffee, Jr., *Gatekeepers: The Professions and Corporate Governance* (2006) [hereinafter *Gatekeepers*]; John C. Coffee, Jr., *Gatekeeper Failure and Reform: The Challenge of Fashioning Relevant Reforms,* 84 B.U. L.Rev. 301 (2004) [hereinafter *Gatekeeper Failure and Reform*]; Lawrence A. Cunningham, *Beyond Liability: Rewarding Effective Gatekeepers,* 92 Minn. L.Rev. 323 (2007); Assaf Hamdani, *Gatekeeper Liability,* 77 S. Cal. L.Rev. 53 (2003); Reinier H. Kraakman, *Corporate Liability Strategies and the Costs of Legal Controls,* 93 Yale L.J. 857 (1984); Frank Partnoy, *Barbarians at the Gatekeepers?: A Proposal for a Modified Strict Liability Regime,* 79 Wash. U. L.Q. 491 (2001) [hereinafter *Barbarians*]; Frank Partnoy,

*Strict Liability for Gatekeepers: A Reply to Professor Coffee,* 84 B.U. L.Rev. 365 (2004) [hereinafter *Strict Liability for Gatekeepers*]; Andrew F. Tuch, *Multiple Gatekeepers,* 96 Va. L.Rev. 1583 (2010). This decision need not plumb the depths of the literature or grapple with the multi-faceted nuances of gatekeeper liability. It suffices for present purposes that liability for gatekeepers is not irrational, meaning that the General Assembly could have intended rationally to limit exculpation to directors and exclude other actors, including gatekeepers who aided and abetted a breach of the duty of care.

**15.** *See Gatekeepers, supra,* at 334; *Gatekeeper Failure and Reform, supra,* at 346–53; Cun-

Framed for present purposes, the prospect of aiding and abetting liability for investment banks who induce boards of directors to breach their duty of care creates a powerful financial reason for the banks to provide meaningful fairness opinions and to advise boards in a manner that helps ensure that the directors carry out their fiduciary duties when exploring strategic alternatives and conducting a sale process, rather than in a manner that falls short of established fiduciary norms. It is not irrational for the General Assembly to have excluded aiders and abettors from the ambit of those receiving exculpation under Section 102(b)(7). The statutory language therefore controls.

Because the exculpatory provision does not apply, the fiduciary analysis in this decision stops with the application of the standard of review. From a doctrinal standpoint, this opinion need not proceed further and attempt to categorize the directors' conduct under the headings of loyalty or care, nor need it assess the individual directors' subjective motivations. The parties did not ask for findings on these issues either. The plaintiffs did not press a loyalty claim in their post-trial briefing, and when advancing its contribution claim, RBC did not argue for director-by-director determinations of culpability. This decision has not made them. The question rather is whether the Board's actions fell within a range of reasonableness. If not, then the directors breached their fiduciary duties, and the second element of a claim for aiding and abetting is met.

### 4. Certain Decisions Fell Outside The Range Of Reasonableness.

 As applied in M & A situations, the enhanced scrutiny standard of review asks whether the defendant directors employed a reasonable decision-making process and reached a reasonable result. *QVC,* 637 A.2d at 45. There is, of course, "no single blueprint that a board must follow to fulfill its duties." *Barkan v. Amsted Indus., Inc.,* 567 A.2d 1279, 1286 (Del.1989). "Directors are not required by Delaware law to conduct an auction according to some standard formula...." *Mills,* 559 A.2d at 1286. Nevertheless, the range-of-reasonableness standard has substance, and Delaware Supreme Court precedents offer meaningful guidance. *See Malone v. Brincat,* 722 A.2d 5, 10 (Del. 1998) (explaining that "the fiduciary duty of a Delaware director is unremitting" and that "the exact course of conduct that must be charted to properly discharge that responsibility will change in the specific context of the action the director is taking with regard to either the corporation or its shareholders," but stressing that "[t]his Court has endeavored to provide the directors with clear signal beacons and brightly lined-channel markers as they navigate with due care, good faith, and loyalty on behalf of a Delaware corporation and its shareholders").

 One of the Delaware Supreme Court's clearest teachings is that "directors cannot be passive instrumentalities during merger proceedings." *Cede & Co. v. Technicolor, Inc. (Technicolor Plenary II),* 634 A.2d 345, 368 (Del.1993). "[A] board of directors ... may not avoid its active and direct duty of oversight in a matter as significant as the sale of [a corporation.]" *Mills,* 559 A.2d at 1281; *accord Citron v. Fairchild Camera & Instrument Corp.,* 569 A.2d 53, 66 (Del.1989). Moreover, directors must maintain "an active and direct role in the context of a sale

ningham, *supra,* at 338–41; Hamdani, *supra,* at 98–105; Kraakman, *supra,* at 888–91; *Barbarians, supra,* at 540–46; *Strict Liability for*

*Gatekeepers, supra,* at 366–68; Tuch, *supra,* at 1608–13.

of a company from beginning to end." *Technicolor Plenary II*, 634 A.2d at 368.

 Part of providing active and direct oversight is becoming reasonably informed about the alternatives available to the company. "The need for adequate information is central to the enlightened evaluation of a transaction that a board must make." *Barkan*, 567 A.2d at 1287. "[M]ergers or recapitalizations . . . may be authorized by a board only advisedly. There must be a reasonable basis for the board of directors involved to conclude that the transaction involved is in the best interest of the shareholders. This involves having information about possible alternatives." *City Capital Assocs. Ltd. P'ship v. Interco Inc.*, 551 A.2d 787, 802 (Del.Ch.1988) (Allen, C.). The scope of the required information includes a reasonably adequate understanding of the value of not engaging in a transaction at all. Directors must "act on an informed basis to independently ascertain how the merger consideration being offered . . . compare[s] to [the company's] value as a going concern." *McMullin v. Beran*, 765 A.2d 910, 919 (Del.2000); *accord Dollar Thrifty*, 14 A.3d at 612 ("[T]he Board was entitled, indeed arguably required . . . to consider the attractiveness of [the offer] in light of the company's fundamental value."). The directors not only must receive the information, but also have adequate time to consider it. "The imposition of time constraints on a board's decision-making process may compromise the integrity of its deliberative process. History has demonstrated boards that have failed to exercise due care are frequently boards that have been rushed." *McMullin*, 765 A.2d at 922 (internal quotation marks omitted).

 Another part of providing active and direct oversight is acting reasonably to learn about actual and potential conflicts faced by directors, management, and their advisors.[16] In a sale process, "the role of outside, independent directors becomes particularly important because of the magnitude of a sale of control transaction and the possibility, in certain cases, that management," and here I add other interested parties, such as contingently compensated professionals like investment bankers, "may not necessarily be impartial." *QVC*, 637 A.2d at 44. Because of the central role played by investment banks in the evaluation, exploration, selection, and implementation of strategic alternatives, directors must act reasonably to identify and consider the implications of the investment banker's compensation structure, relationships, and potential conflicts.[17]

16. *See Technicolor Plenary IV*, 663 A.2d at 1168 (director conflicts); *El Paso*, 41 A.3d at 434 (financial advisor and CEO conflicts); *Del Monte*, 25 A.3d at 818 (financial advisor conflict); *In re Lear Corp. S'holder Litig.*, 926 A.2d 94, 114 (Del.Ch.2007) (CEO conflict).

17. *See Mills*, 559 A.2d at 1283–86, 1284 n. 33 (granting targeted injunction on appeal against asset lock-up and no-shop clause where directors relied on advice from conflicted management and its financial advisor, whose advice "share[d] the same defects" as management's); *El Paso*, 41 A.3d at 444 (finding reasonably probability of success on the merits where directors relied on conflicted financial advisor and CEO with secret interest in post-transaction LBO); *Del Monte*, 25 A.3d at 833–35 (granting injunction against merger where financial advisor sought to put company in play to achieve a fee event, teamed bidders in violation of standstill provision, sought and obtained a buy-side financing role in the midst of pricing negotiations with private equity buyer, and conducted the go-shop process despite buy-side conflict); *Ortsman v. Green*, 2007 WL 702475, at *1 (Del.Ch. Feb. 28, 2007) (ordering expedited discovery into board decisionmaking process where target's financial advisor participated in the buy-side financing even though company retained a separate financial advisor to render a fairness

### a. The Decision To Run A Sale Process In Parallel With The EMS Process

 The plaintiffs challenge the reasonableness of initiating a sale process in December 2010 to run in parallel with the EMS auction. Absent conflicts of interest, this decision would be one of the many debatable choices that fiduciaries and their advisors must make when exploring strategic alternatives in an uncertain world, and it would fall within the range of reasonableness. Where undisclosed conflicts of interest exist, however, those choices "must be viewed more skeptically." *El Paso*, 41 A.3d at 434; *accord Del Monte*, 25 A.3d at 817. Viewed skeptically, the decision to initiate a sale process in December 2010 fell outside the range of reasonableness.

As a threshold matter, the decision to initiate a sale process falls short under enhanced scrutiny because it was not made by an authorized corporate decisionmaker. The Board did not make the decision to launch a sale process, nor did it authorize the Special Committee to start one. The Board charged the Special Committee with pursuing "an in-depth analysis of the alternatives discussed during the meeting." JX 180 at 3. Instead of carrying out that directive, the Special Committee hired RBC to sell the Company, then RBC and Shackelton put Rural in play without Board authorization.

Setting aside this fundamental problem, the decision to initiate a sale process fails the enhanced scrutiny test because RBC did not disclose that proceeding in parallel with the EMS process served RBC's interest in gaining a role on the financing trees of bidders for EMS. RBC correctly perceived that the firms bidding for EMS would think they would have the inside track on Rural if they included RBC on their trees. RBC believed that as the financial advisor to Rural, it could get on all of the EMS bidders' financing trees. Focusing exclusively on financial buyers and prioritizing the participants in the EMS process was the ideal strategy for RBC. "[W]hen directors have made the decision to sell the company, any favoritism they display toward particular bidders must be justified solely by reference to the objective of maximizing the price the stockholders receive for their shares." *In re Topps Co. S'holders Litig.*, 926 A.2d 58, 64 (Del.Ch.2007). If directors "bias the process" in favor of certain bidders and against others "not in a reasoned effort to maximize advantage for the stockholders, but to tilt the process toward the bidder more likely to continue current management, they commit a breach of fiduciary duty." *Id.; accord In re Netsmart Techs., Inc. S'holders Litig.*, 924 A.2d 171, 195–96 (Del.Ch.2007). The same is true when a process is biased in favor of bidders who are most likely to generate fees for a financial advisor. This is precisely the type of "evidence of self-interest . . . that calls into question the integrity of the process" and "typically drives a finding of unreasonableness." *Del Monte*, 25 A.3d at

opinion); *Khanna v. McMinn*, 2006 WL 1388744, at *25 (Del.Ch. May 9, 2006) (finding plaintiffs had raised facts sufficient to "create a reasonable doubt that the transaction was the product of a valid exercise of business judgment" where investment bank provided a bridge loan to the target and thus had an interest in ensuring the closing of the transaction); *Toys "R" Us*, 877 A.2d at 1005–06 (closely scrutinizing whether an invest-

ment banker's role in providing staple financing created a conflict of interest that tainted board process and merited injunctive relief); *In re Prime Hospitality, Inc. S'holders Litig.*, 2005 WL 1138738, at *12 (Del.Ch. May 4, 2005) (rejecting settlement of *Revlon* claim and questioning "how can the Court attribute weight to the notion that Bear Stearns [the allegedly conflicted banker] was retained by Prime to shop the company?").

831; *accord El Paso,* 41 A.3d at 439 (explaining that enhanced scrutiny requires that "directors take reasonable steps to obtain the highest value reasonably attainable and that their actions are not compromised by impermissible considerations, such as self-interest").

Absent these problems, whether the launch of an immediate sale process fell within the range of reasonableness would present a close call. RBC recommended an immediate sale on December 23, 2010, and scheduled first round bids for late January 2011 because that "[t]rack[ed] with [the EMS] process and [Rural's] ability to act as an 'angle.'" JX 225A at 11. RBC did not discuss obvious and readily foreseeable disadvantages of that schedule, such as the fact that standard M & A confidentiality agreements would restrict the bidders' ability to participate in both processes. A bidder for EMS would need a separate team of advisors to participate in the Rural process, and those individuals could not share confidential information with the advisors working on a potential EMS acquisition. RBC also did not explain that a successful bidder for EMS would own a Rural competitor, making it difficult for Rural to provide due diligence freely to that bidder. As an expert advisor, RBC's job was to think several moves ahead and provide precisely this type of input. Munoz agreed at trial that these were obvious issues. There is no contemporaneous evidence that they were identified and considered.

Additionally, RBC's near-term process did not account for Rural's need to generate a track record with its acquisition strategy. One of the lessons RBC claimed to have learned from the Consortium process was that private equity bidders would not pay for an acquisition strategy that lacked a track record. In November 2010, RBC advised waiting to begin a sale process until after Rural had "time to further build value through its successful growth initiatives [such] as StingRay, Santa Clara and potentially Israel [another prospective acquisition]." JX 136 at 1. One month later, RBC ignored its earlier advice and recommended a near-term sale.

Admittedly, on the other side of the coin, there were identifiable benefits to initiating a sale process in December. When the Board tasked the Special Committee with hiring an advisor to develop a menu of strategic alternatives and make a recommendation, Rural's stock price had risen almost 400% in the last two years. The stock traded up further after the announcement of the EMS process based on speculation that Rural would also be sold. RBC logically predicted that if Rural did not achieve a transaction, then Rural's stock price would likely fall. A well-informed board could have thought it appropriate to seize the moment and try to achieve a transaction priced off the higher-than-normal values generated by the market's newfound interest in the ambulance sector. A well-informed board also might have believed that aligning Rural's process with the EMS process would lead bidders for EMS to incorporate their plans for Rural into the prices they offered to pay for EMS. Presumably, the anticipated synergies would give bidders that were interested in Rural an edge over those who were not. This could inure to Rural's advantage if the winner of the EMS process then sought to acquire Rural, because Rural could seek to extract a portion of the synergies from a combination of AMR and Rural in the form of a higher price. In addition, a well-informed board could have taken into account the competitive threats Rural would face once EMS went private. AMR had been a desultory competitor with operating metrics that lagged Rural's. A private equity owner could be expected to re-energize AMR, improve its operating

metrics, and turn AMR into a serious challenger. If Rural continued as a public company, it would have an advantage over AMR in using its stock to acquire local or regional players, but Rural's public disclosures would place Rural at an informational disadvantage to the now-private AMR.

Although a well-informed board might have considered these issues and reasonably decided to pursue a near term sale process, neither the Board nor the Special Committee made such a decision. Shackelton and RBC unilaterally put Rural into play, and RBC was motivated by a desire to secure its place in the financing trees of the bidders in the EMS auction. Based on the totality of the evidence, the initiation of a sale process in December 2010 fell outside the range of reasonableness. Shackelton and RBC got too far out in front of the Board, and RBC's advice was overly biased by its financial interests.

**b. The Decision To Continue The Sale Process Despite Feedback That The Strategy Was Not Working**

██ The plaintiffs next challenge the reasonableness of continuing the sale process in light of feedback from multiple sources that the parallel-process strategy was not working. Even viewed skeptically, the decision fell within the range of reasonableness.

In its pitch to the Special Committee on December 23, 2010, RBC predicted that bidders for EMS would participate in Rural's process and that the finalists in the EMS process would be the most eager buyers of Rural. JX 225A at 11. By December 30, 2010, KKR and Bain had expressed misgivings about considering two deals at once.

The negative feedback from process participants continued during January 2011. RBC had told the Special Committee that it anticipated that "[s]everal private equity firms in [the EMS] process will choose to be pre-emptive and bid for [Rural] in early January to track with the [EMS] process." *Id.* None did. Separately, J.P. Morgan provided an analysis of Rural's situation that recommended deferring any sale until after Rural had developed a track record with its acquisition strategy and potential strategic acquirers were not distracted with changes-of-control transactions of their own. On January 29, when the initial bid deadline arrived, CD & R was the only finalist for EMS to submit an indication of interest for Rural.

Although the process had not unfolded as predicted, the Special Committee received six indications of interest from private equity firms at substantial premiums to where Rural's stock had traded before EMS announced its process. Even after CD & R dropped out, the Special Committee had five meaningful expressions of interest. Those indications were at a substantial premium to Rural's market price and at the high end of the LBO range in RBC's December 23, 2010 pitch book.

When the Special Committee met on February 6, 2011, it would have been better for the Special Committee to have received a presentation from RBC that analyzed the value of the expressions of interest compared to other strategic alternatives available to the Company, including remaining independent. RBC's presentation did not include any valuation metrics, but that was not a fatal flaw. Once Rural started had its sale process, it fell within a range of reasonableness for the directors to continue onward despite initial negative feedback.

**c. The Decision To Approve Warburg's $17.25 Bid**

██ The plaintiffs also challenge the Board's decision to accept Warburg's bid of $17.25 per share. During the final ne-

gotiations with Warburg, the Board failed to provide active and direct oversight of RBC. When it approved the merger, the Board was unaware of RBC's last minute efforts to solicit a buy-side financing role from Warburg, had not received any valuation information until three hours before the meeting to approve the deal, and did not know about RBC's manipulation of its valuation metrics. Under the circumstances, the Board's decision to approve Warburg's bid lacked a reasonable informational basis and fell outside the range of reasonableness.

 It was during the final stages of the negotiations between Rural and Warburg that direct and active oversight by independent directors was needed most. RBC led this phase of the negotiations, which forced RBC to confront powerfully conflicting incentives. Although a contingent compensation arrangement that pays an agent a percentage of deal value generally will align the interests of the agent in

getting more compensation with the principal's desire to obtain the best value,[18] the interests of the agent and principal diverge over whether to take the deal in the first place. The agent only gets paid if the deal happens, but for the principal, the best value may be not doing the deal at all. The same divergent interests play out on a smaller scale during final negotiations over price. The contingently compensated agent has a greater incentive to get the deal done rather than push for the last quarter, particularly if pushing too hard might jeopardize the deal and if the terms on offer are already defensible.[19] If the agent is a repeat player, the agent can generate greater aggregate compensation by completing more total transactions with slightly less compensation on each deal. When the opposite side in the negotiation is a repeat player that has used and could continue to use the agent's services, then the incentives to maintain goodwill and not push too hard become all the greater.[20]

18. *See, e.g., In re Atheros Commc'ns, Inc. S'holder Litig.*, 2011 WL 864928, at *8 (Del. Ch. Mar. 4, 2011) (observing that "[c]ontingent fees are undoubtedly routine; they reduce the target's expense if a deal is not completed; perhaps, they properly incentivize the financial advisor to focus on the appropriate outcome"); *Van de Walle v. Unimation, Inc.*, 1991 WL 29303, at *3 (Del.Ch. Mar. 7, 1991) (noting that a contingent fee creates "an incentive to obtain the best available price for all ... stockholders").

19. *See El Paso*, 41 A.3d at 442 (discussing how a $35-million-or-nothing contingent fee made "more questionable some of the tactical advice given by Morgan Stanley and some of its valuation advice"); *Atheros*, 2011 WL 864928, at *8 (noting that a "contingent fee can readily be seen as providing an extraordinary incentive for [an investment bank] to support the Transaction"); *Forgo v. Health Grades, Inc.*, C.A. No. 5716–VCS, at 10 (Del. Ch. Sept. 3, 2010) (TRANSCRIPT) ("[T]he reality is if [the investment bank] can get a deal, they get a deal."); *Netsmart*, 924 A.2d at 199 (noting that although investment bank

would receive 1.7% of any deal, it had "a strong incentive to bring about conditions that would facilitate a deal that would close"); *In re Tele–Communications, Inc. S'holders Litig.*, 2005 WL 3642727, at *10 (Del.Ch. Jan. 10, 2006) ("[T]he contingent compensation of the financial advisor, DLJ, of roughly $40 million creates a serious issue of material fact, as to whether DLJ (and DLJ's legal counsel) could provide independent advice to the Special Committee."); *cf. Lear*, 926 A.2d at 116 (explaining "fiduciary quandary" faced by CEO with a large, vested equity stake who could cash out his shares via a transaction but could not otherwise sell).

20. *See El Paso*, 41 A.3d at 444 (noting that conflicted negotiator has a duty "to squeeze the last drop of the lemon out for ... stockholders," but that the conflict gave the negotiator "a motive to keep juice in the lemon that he could use to make a financial Collins for himself"); *id.* ("[A] fist fight of a negotiation might leave a bloodied [adversary] unreceptive to a [future deal]...."); *Gesoff v. IIC Indus. Inc.*, 902 A.2d 1130, 1150–51 (Del.Ch. 2006) (holding that investment bank's rela-

RBC fell victim to these incentives during the final negotiations with Warburg. Rather than pushing for the best deal possible for Rural, RBC did everything it could to get a deal, secure its advisory fee, and further its chances for additional compensation from Warburg. On March 15, 2011, with Warburg emerging as the likely buyer, RBC sought internal approval to underwrite up to 100% of a $590 million financing package for Warburg. JX 420. The coverage team supported the proposed financing commitment "as it will further strengthen our relationship and lead to additional deal flow with WP." *Id.* at 3, 16. Projected fees were "$16.3MM for 100% [underwriting] or $8.2MM for 50% [underwriting]." *Id.* at 16. When Warburg delivered a bid package that did not include RBC as one of its financing banks, RBC re-doubled its efforts on the financing front and played nice on the deal front. Carney of Warburg testified: "[W]e had additional conversations with RBC because they continued to try to find a way into the financing...." Carney Dep. at 52. On March 23 and 24, Carney had numerous conversations with Rural's bankers. From these calls, Carney learned about the internal dynamics in the Rural boardroom, including the various directors' competing views on price. *See* JX 494; Carney Dep. at 13–14.

No one ever told the Board that its bankers had helped Warburg by giving Carney this information. No one ever told the Board that senior leveraged financing bankers at RBC spent March 26, 2011, making a final push to get a role in Warburg's financing, including by offering to fund a $65 million revolver for a different Warburg portfolio company. There was no conceivable upside for Rural from RBC's last-minute lobbying of Warburg. The downside for Rural was to accentuate RBC's desire to generate goodwill with Warburg and close the deal.

RBC's secret lobbying illustrates the Board's failure to place meaningful restrictions on RBC. Although the Special Committee's counsel advised the committee on December 23 "that, if the Committee were to select RBC, the Committee would need to be especially active and vigilant in assuring the integrity of the [process]," JX 224 at 2, the Rural directors did not provide any guidance about when staple financing discussions should start or cease, made no inquiries on that subject, and imposed no practical check on RBC's interest in maximizing its fees. *Cf. El Paso*, 41 A.3d at 434 ("Although Goldman's conflict was known, inadequate efforts to cabin its role were made.").

At the same time that RBC's leveraged finance bankers were engaging in last-minute lobbying with Warburg, the RBC M & A team was working to lower the analyses in its fairness presentation to make Warburg's bid of $17.25 look more attractive. For three months, RBC had failed to provide Rural's Board or the Special Committee with a preliminary valuation analysis. The Board did not see any valuation materials whatsoever until after 9:30 p.m. Eastern time on Sunday night, March 27, 2011, less than twelve hours before the expiration of Warburg's bid. The Special Committee saw RBC's pitch book on December 23, 2010, then did not see another set of valuation materials until the late-night board book on March 27, 2011.

Because RBC did not prepare a valuation deck until March 27, RBC was not

tionship with buy-side controlling stockholder "robs [its] fairness opinion of its value as an indicator of fairness"); *cf. Lear*, 926 A.2d at 116 (noting that if CEO received equity on the buy side post-merger, "the failure to get the [optimal] price for Lear now would not hurt him as much as the public stockholders").

prepared to discuss valuation at critical meetings in March 2011. During the final negotiations over price, RBC took advantage of the informational vacuum it created to prime the directors to support a deal at $17.25. *See, e.g.,* JX 464 ("Let's all plan to do a call [with] Shackelton before Board call. . . . Need to manage him before he gets on [with the] Board."); *Cf. El Paso,* 41 A.3d at 441 (citing problems created by conflicted financial advisor "hav[ing] its hands in the dough" of the financial analyses of potential alternatives; noting "questionable aspects" to the conflicted financial advisor's valuation "that could be seen as suspicious"); *id.* at 444–45 (citing "odd aspects to some of the financial analyses presented, which seem to go some way to making the . . . bid look more favorable . . . than perhaps a more consistent approach to valuation would have done"). Munoz encouraged DiMino to drum up director support for Warburg's bid and offered to provide valuation-related "tidbits." JX 489. The "tidbits" were persuasive because the full Board had never received a valuation presentation from RBC.

On March 27, 2011, RBC finally provided the Board with a board book designed to convince them to accept Warburg's bid of $17.25 per share. Aspects of the board materials conflicted with RBC's earlier advice, contravened the premises underlying the Board's business plan for Rural, and contained outright falsehoods. Most notably, the March book used what RBC labeled "consensus earnings" for 2010, which gave no value to Rural's acquisitions and did not add back $6.3 million in one-time expenses. The presentation justified the "consensus" figures by claiming "Wall Street research analysts covering [Rural] do not make pro forma adjustments." JX 548 at 15. This was false. The analysts in fact account for and add back one-time expenses. *See* JX 364 (email attaching three analyst reports, each of which notes the necessity of adjusting EBITDA to account for Rural's one-time expenses).

Lacking any earlier valuation information, the Rural directors did not have a reasonably adequate understanding of the alternatives available to Rural, including the value of not engaging in a transaction at all. Because the Board's financial advisors did not provide the directors with valuation materials until the final board meeting, just hours before the merger was approved, the directors did not have an opportunity to examine those materials critically and understand how the value of the merger compared to Rural's value as a going concern. *See McMullin,* 765 A.2d at 919. By the time the directors received RBC's book, there was no time to seek follow-up information or probe inconsistencies.

The combination of RBC's behind the scenes maneuvering, the absence of any disclosure to the Board regarding RBC's activities, and the belated and skewed valuation deck caused the Board decision to approve Warburg's offer to fall short under the enhanced scrutiny test. Because RBC misled the Board, this is not a case where a Board's independent sense of the value of the company is sufficient to carry the day. The plaintiffs proved that "the adequacy of the decisionmaking process employed by the directors, including the information on which the directors based their decision" fell outside the range of reasonableness. *See QVC,* 637 A.2d at 45.

### 5. Knowing Participation In The Fiduciary Breaches

 The preceding section identified decisions that fell outside the range of reasonableness, thereby giving rise to a fiduciary breach under the enhanced scrutiny standard. The next question is whether RBC knowingly participated in

the breaches. This element is satisfied when the aider and abettor "act[s] with the knowledge that the conduct advocated or assisted constitutes such a breach." *Malpiede*, 780 A.2d at 1097. On the facts of this case, RBC acted with the necessary degree of *scienter* and can be held liable for aiding and abetting.

### a. Knowing Participation In A Breach Of The Duty Of Care

Because this decision has not parsed whether the directors' conduct constituted a breach of the duty of loyalty, it assumes for purposes of the "knowing participation" element that the directors breached only their duty of care. This court has recognized that a third party can be liable for aiding and abetting, "even if the Board breached only its duty of care."[21] The elements of the claim require an underlying breach of duty, which could be a breach of the duty of loyalty or care, and knowing participation in the breach. The adjective "knowing" modifies the concept of "participation," not breach. It is not the fiduciary that must act with *scienter*, but rather the aider and abettor. If the third party knows that the board is breaching its duty of care and participates in the breach by misleading the board or

creating the informational vacuum, then the third party can be liable for aiding and abetting. Along these lines, Chief Justice Strine, then writing as a Vice Chancellor, suggested in *Goodwin* that a third party could be held liable for aiding and abetting a breach of the duty of care if the third party "purposely induced the breach of the duty of care." 1999 WL 64265, at *28; *see id.* (rejecting an aiding and abetting claim where the record did not support a finding that the third parties "for improper motives of their own, intentionally duped the . . . directors into breaching their duty of care").

This court applied these principles in *Penn Mart Realty Co. v. Becker*, 298 A.2d 349 (Del.Ch.1972). The plaintiffs in *Penn Mart* alleged that the directors of Glen Alden Corporation were negligent in causing Glen Alden to buy and sell shares of Schenley Industries, Inc. In February, Glen Alden acquired a block of 92,700 shares of Schenley. On March 14, Glen Alden sold the Schenley shares to a third party for $63 per share. Less than a week later, Glen Alden bought 945,126 shares of Schenley from a different third party for $80 per share. The next day Glen Alden made a tender offer for Schenley. The

---

21. *In re Celera Corp. S'holder Litig.*, 2012 WL 1020471, at *28 (Del.Ch. Mar. 23, 2012), *aff'd in part, rev'd in part on other grounds*, 59 A.3d 418 (Del.2012); *accord In re BioClinica, Inc. S'holder Litig.*, 2013 WL 5631233, at *11 (Del. Ch. Oct. 16, 2013) ("[I]t is possible that an aider and abettor could be liable for a directors' otherwise exculpated breach of the duty of care."); *In re Wayport, Inc. Litig.*, 76 A.3d 296, 322 n. 3 (Del.Ch.2013) ("[A] non-fiduciary aider and abettor could face different liability exposure than the defendant fiduciaries if, for example, the non-fiduciary misled unwitting directors to achieve a desired result."); *Goodwin v. Live Entm't, Inc.*, 1999 WL 64265, at *28 (Del.Ch. Jan. 25, 1999) (granting summary judgment in favor of defendants charged with aiding and abetting a breach of the duty of care but suggesting that

such a claim could proceed if "third-parties, for improper motives of their own, intentionally duped the Live directors into breaching their duty of care"); *In re Shoe–Town, Inc. S'holders Litig.*, 1990 WL 13475, at *8 (Del. Ch. Feb. 12, 1990) (holding that the pleading adequately alleged that a financial advisor "aided and abetted the board, special committee and management groups' [sic] breach of their fiduciary duties of loyalty and care"); *see also Greenfield v. Tele–Communications, Inc.*, 1989 WL 48738, at *3 (Del.Ch. May 10, 1989) ("But where the charge is conspiracy or knowing participation with a breaching fiduciary, some facts must be alleged that would tend to establish, at a minimum, knowledge by the third party that the fiduciary was endeavoring to breach his duty. . . .").

plaintiff claimed that the directors were grossly negligent in allowing the corporation to sell Schenley shares to a third party for $63 per share at a time when Glen Alden was planning to acquire Schenley. The plaintiff sued Glen Alden's broker and the third party purchaser of the shares for aiding and abetting the breach of fiduciary duty. The defendants argued that for an aiding and abetting claim to exist, the plaintiff had to allege a breach of fiduciary duty sounding in fraud, self-dealing, or other conflict of interest. This court refused to limit the concept of aiding and abetting in that fashion:

> That argument cannot prevail. Fraud and self-dealing are not the only ways in which corporate directors may breach their fiduciary duty; they may also breach that duty by being grossly negligent or by wasting corporate assets. This is what Penn Mart has alleged, and the necessary elements [of an aiding and abetting claim] are therefore made out.

*Id.* at 351–52 (citations omitted).

 The *Restatement (Second) of Torts* supports the availability of aiding and abetting liability where the underlying breach sounds in negligence. Section 876 provides that a defendant can be liable for "harm resulting . . . from the tortious conduct of another" if the defendant:

(a) does a tortious act in concert with the other or pursuant to a common design with him, or

(b) knows that the other's conduct constitutes a breach of duty and gives substantial assistance or encouragement to the other so to conduct himself, or

(c) gives substantial assistance to the other in accomplishing a tortious result and his own conduct, separately considered, constitutes a breach of duty to the third person.

Restatement (Second) of Torts § 876 (1979). A comment on clause b states: "If the encouragement or assistance is a substantial factor in causing the resulting tort, the one giving it is himself a tortfeasor and is responsible for the consequences of the other's act. This is true both when the act done is an intended trespass . . . and when it is merely a negligent act. . . . The rule applies whether or not the other knows his act is tortious." *Id.* cmt. (d). The Delaware Supreme Court often relies on the Restatement (Second) of Torts. *See, e.g., WaveDivision Hldgs., LLC v. Highland Capital Mgmt.*, 49 A.3d 1168, 1174 (Del. 2012); *Riedel v. ICI Ams., Inc.*, 968 A.2d 17, 20–23 (Del.2009). A breach of fiduciary duty is an equitable tort.[22]

It bears emphasizing that the Delaware Supreme Court has not formally ruled on this issue. In *Malpiede*, the Delaware Supreme Court held that the allegations of the complaint did not support an inference that the acquirer knowingly participated in any breach of duty when negotiating a merger, and the Supreme Court therefore declined to express a "view on the question whether a third party may 'knowingly participate' in or give substantial assistance to

22. *See Hampshire Gp., Ltd. v. Kuttner*, 2010 WL 2739995, at *54 (Del.Ch. July 12, 2010) ("A breach of fiduciary duty is easy to conceive of as an equitable tort."); *see also Sloan v. Segal*, 2008 WL 81513, at *9 (Del.Ch. Jan. 3, 2008) (explaining for purposes of applying Delaware's long arm statute that a defendant "could be viewed as having committed actions in the nature of a tort—a breach of fiduciary duty, an equitable obligation—in Delaware"). *See generally* J. Travis Laster & Michelle D. Morris, *Breaches of Fiduciary Duty and the Delaware Uniform Contribution Act*, 11 Del. L.Rev. 71, 71 (2010) (tracing history of treatment of breach of fiduciary duty actions and "conclud[ing] that a breach of a fiduciary duty is in fact a tort, although a unique species historically called an 'equitable tort' ").

a board's grossly negligent conduct or whether a third party may be liable for aiding and abetting only if the board's breach is intentional." 780 A.2d at 1097 n. 78. Nevertheless, the Delaware Supreme Court's opinion in *Arnold IV* indicates that a third party can be liable for aiding and abetting a breach of the duty of care.

As previously noted, the Court of Chancery in *Arnold I* granted summary judgment in favor of the defendant directors on claims that they breached their fiduciary duties during the sale of Society of Savings Bancorp. On appeal, the Delaware Supreme Court reversed, holding that the sell-side directors made materially misleading partial disclosures, but the high court also determined that an exculpatory provision shielded the directors from liability because their breaches only involved the duty of care. *Arnold II*, 650 A.2d at 1290. On remand, the Court of Chancery held that the plaintiffs could not proceed against the directors under any theory, but they could maintain a claim against the acquirer for aiding and abetting the breach of the duty of care that resulted in the misleading disclosures, notwithstanding that the defendant directors were protected by an exculpatory provision. *Arnold III*, 1995 WL 376919, at *8. This time, the Delaware Supreme Court affirmed the Court of Chancery's analysis and remanded for further proceedings on the aiding

and abetting claim. *Arnold IV*, 678 A.2d at 541–542. If a third party could not aid and abet a violation of the duty of care, then the Delaware Supreme Court would have reversed the Court of Chancery and entered judgment for the defendants. *Arnold IV* implies that a third party can aid and abet a violation of the duty of care.[23]

### b. RBC Knowingly Participated By Inducing The Breaches Of Duty.

██ For purposes of the aiding and abetting claim against RBC, this decision need hold only that a claim for aiding and abetting a breach of the duty of care can be maintained under the circumstances envisioned by Chief Justice Strine in *Goodwin:* when a third party, for improper motives of its own, misleads the directors into breaching their duty of care.[24] That is precisely what RBC did.

RBC *created* the unreasonable process and informational gaps that led to the Board's breach of duty. At the outset, RBC knew that it was not disclosing its interest in obtaining a role financing the acquisition of EMS or how it intended to use the Rural process to capture the EMS financing business.

RBC similarly knew that the Board and the Special Committee were uninformed about Rural's value when making critical

---

23. *See also In re Celera Corp. S'holder Litig.,* 59 A.3d 418, 424–27, 436 (Del.2012) (reversing denial of opt-out in favor of objector and describing objector's claim that a financial advisor aided and abetted a due care violation, based on evidence the advisor knew its financial analysis was questionable, as "clearly identified and supportable"); *Mills,* 559 A.2d at 1285–86, 1288 (granting targeted injunction against asset lock-up and no-shop provision in restructuring agreement with MBO sponsor where directors breached only their duty of care but were affirmatively misled by management and its financial advisor).

24. 1999 WL 64265, at *28; *see also Mills,* 559 A.2d at 1283–84, 1284 n. 33 (describing management's knowing silence about a tip as "a fraud on the Board"); *Del Monte,* 25 A.3d at 836 (holding that investment bank's knowing silence about its buy-side intentions, its involvement with the successful bidder, and its violation of a no-teaming provision misled the board); *cf. Technicolor Plenary IV,* 663 A.2d at 1170 n. 25 ("[T]he manipulation of the disinterested majority by an interested director vitiates the majority's ability to act as a neutral decision-making body.").

decisions. RBC had not provided any preliminary valuation analysis since December 23, 2010, and had only provided its December 23 book to the Special Committee.

Most egregiously, RBC never disclosed to the Board its continued interest in buy-side financing and plans to engage in last minute lobbying of Warburg. *Cf. El Paso,* 41 A.3d at 443 ("Worst of all was that the supposedly well-motivated and expert CEO entrusted with all the key price negotiations kept from the Board his interest in pursuing a management buy-out of the Company's E & P business."). As a result, it was natural for the Board to assume that Warburg's fully financed bid left RBC out of the picture and to send RBC to negotiate with Warburg. RBC knew and failed to disclose to the Board that on Saturday, March 26, 2011, senior bankers at RBC were engaged in a full-court press to convince Warburg to use RBC's staple financing or include RBC in the financing package. While those fevered efforts were underway, RBC was simultaneously revising its valuation of Rural downward. Munoz coordinated between the two groups but did not disclose RBC's activities to the Board.

To show that a financial advisor acted with *scienter,* a stockholder plaintiff typically points to evidence of a conflict of interest diverting the advisor's loyalties from its client, such that the advisor, like the bankers in *Del Monte* and *El Paso,* "is being paid in some fashion something he would not otherwise get in order to assist in the breach of duty." *Greenfield,* 1989 WL 48738, at *3 n. 2. That is precisely what happened here. RBC knew that the Board was uninformed about these critical matters, but failed to disclose the relevant information to further its own opportunity to close a deal, get paid its contingent fee, and receive additional and far greater fees for buy-side financing work.

Contrary to RBC's argument, the fact that RBC ultimately did not provide staple financing and receive the buy-side fees it coveted does not mean that RBC did not act consciously to obtain them. *See In re Transkaryotic Therapies, Inc.,* 954 A.2d 346, 373 n. 118 (Del.Ch.2008) ("That the [transaction] was never consummated is wholly irrelevant for this determination. The offer of improper inducement . . . may still give rise to aiding and abetting liability if that inducement results in the breach of a fiduciary's duty, even if, as here, the deal to which the inducement was related . . . is never completed."). Humans do not always achieve the ends we seek. Failure does not imply that we did not pursue the means. Elite athletes spend years training and sacrificing for a chance at an Olympic medal. To not qualify at the trials, or to fall short of the podium, does not negate the pursuit. RBC knowingly participated in the Board's breach of its duty of care by creating the informational vacuum that misled the Board.

### 6. The Engagement Letter Does Not Insulate RBC From Liability.

RBC has argued that its engagement letter precludes any claim against RBC for aiding and abetting the Board. The relevant provision of the engagement letter states:

As financial organizations, RBC and Moelis and their affiliates may also provide a broad range of normal course financial products and services to their customers . . ., including companies that may be involved in a Transaction contemplated by this Agreement and . . . may arrange and extend acquisition financing or other financing to . . . purchasers that may seek to acquire companies or businesses that offer products and services that may be substantially similar to those offered by the Company.

JX 280 at 8. This generalized acknowledgment that RBC and Moelis might extend acquisition financing to other firms did not amount to a non-reliance disclaimer that would waive or preclude a claim against RBC for failing to inform the Board about specific conflicts of interest. *See RAA Mgmt., LLC v. Savage Sports Hldgs., Inc.*, 45 A.3d 107, 116–19 (Del.2012) (explaining why clear and unambiguous non-reliance disclaimer clauses and waiver provisions are enforceable to bar certain fraud claims under New York and Delaware law). Rural did not waive any claim that RBC's sell-side advice was tainted by an undisclosed material self-interest. If RBC thought it was obtaining a waiver in the engagement letter without first disclosing the conflict and its import, then it was committing "what, in the old days, might have been called constructive fraud." *Hollinger Int'l, Inc. v. Black*, 844 A.2d 1022, 1068 (Del.Ch.2004), *aff'd*, 872 A.2d 559 (Del.2005).

### 7. Causally Related Damages

 The final element of aiding and abetting is proof that the aided-and-abetted breach caused damages to the plaintiff. *Malpiede*, 780 A.2d at 1096; *Gilbert v. El Paso Co.*, 490 A.2d 1050, 1057 (Del.Ch. 1984); *see also Gotham P'rs, L.P. v. Hallwood Realty P'rs, L.P.*, 817 A.2d 160, 172–73 (Del.2002) (affirming finding of joint and several liability for aider and abettor). The plaintiffs proved at trial that RBC's actions proximately caused the Board's breach of fiduciary duty and damaged Rural's stockholders by causing the Company to be sold at a price below its fair value. The evidence at trial demonstrated persuasively that the fair value of Rural's stock at the time of the sale exceeded the $17.25 per share that Warburg was willing to pay.

RBC's self-interested manipulations caused the Rural process to unfold differently than it otherwise would have. *See Del Monte*, 25 A.3d at 833 ("But for Barclays' manipulations, the Del Monte process would have played out differently."). RBC's actions led to (i) an ill-timed sale of Rural that did not capture value attributable to its acquisition strategy; (ii) a mismanaged sale process that generated only one final bid by a bidder that knew it had the upper hand in bidding and price negotiations; and (iii) uninformed board approval based on manipulated valuation analyses. To be sure, "[n]o one can tell what would have happened had unconflicted parties negotiated the Merger. That is beyond the capacity of humans." *El Paso*, 41 A.3d at 447. Nevertheless, but for RBC's actions, a fully-informed Board would have had numerous opportunities to achieve a superior result.

A disinterested board that benefitted from disinterested advice and actually obtained an analysis of potential alternatives likely would have concluded that Rural should wait before conducting a sale process. DiMino advised that approach in November 2010, and J.P. Morgan recommended it in January 2011. But RBC had powerful reasons to push for an immediate sale in tandem with the EMS auction, even though that path created problems for Rural's efforts to maximize value.

A disinterested board that benefitted from disinterested advice would not have sent a conflicted agent to negotiate with Warburg from a position of weakness. Warburg recognized that "the concurrent timing of the EMS process created a unique competitive dynamic" that gave Warburg the advantage. JX 628 at 9. Because Warburg did not make it into the second round of the EMS process, Warburg was "able to pursue [Rural] aggressively." *Id.* Carney correctly perceived that the March 22 bid deadline benefitted Warburg, because no other potential bidder had completed due diligence and ar-

ranged financing. Carney Dep. at 190. Rural's bankers tipped Carney about the Company's internal boardroom discussions on March 23, including the various directors' views on price. *See* JX 494 at 2. Carney observed that the "bankers are now nervous and want to get something done." JX 510.

A disinterested board that benefitted from disinterested advice would have received valuation materials periodically throughout the process, rather than getting a valuation deck for the first time after 9:30 p.m. on March 27 and then approving the merger shortly after midnight. A well-informed board assisted by disinterested advisors would have understood Rural's going concern value and been able to evaluate whether to continue to pursue the Company's business plan and preserve the opportunity for a sale at a more opportune time in the future, rather than relying at the last minute on valuation materials that RBC manipulated while making a final push for a role in Warburg's buy-side financing.

As a result of this faulty process, the merger did not generate for stockholders the best value reasonably attainable. Ordinarily this court places heavy reliance on the terms of a transaction that was negotiated at arm's length, particularly if the transaction resulted from an effective pre—or post-agreement market canvas.[25] Given the confluence of factors present here, exclusive reliance on the negotiated deal price is inappropriate. When Shackelton and RBC put Rural into play, the Company was just beginning to implement new growth strategies under a new CEO. Rural's strong operating metrics, solid balance sheet, and national footprint made it uniquely able to benefit from industry trends favoring consolidation and long-term growth in ambulance services. But Rural was a relatively small issuer and the only pure-play publicly traded company in its sector. Analysts perceived the Company to be in the early stages of its growth cycle such that long-term opportunities were not reflected in their one-year models. And Rural closely guarded its acquisition and expansion pipelines and its projections. When the sale process started, the market did not understand Rural's prospects. The fact that the deal with Warburg generated a premium over the pre-announcement market price did not mean that the merger was the best value reasonably available or that stockholders were not harmed by RBC's activities.[26]

---

**25.** *See, e.g., Huff Fund Inv. P'ship v. CKx, Inc.*, 2013 WL 5878807, at *11 (Del.Ch. Nov. 1, 2013) ("In the absence of comparable companies or transactions to guide a comparable companies analysis or a comparable transactions analysis, and *without reliable projections* to discount in a DCF analysis, I rely on the merger price as the best and most reliable indication of CKx's value."); *Highfields Capital, Ltd. v. AXA Fin., Inc.*, 939 A.2d 34, 42 (Del.Ch.2007) (noting that when a merger "resulted from an arm's-length process between two independent parties, ... a reviewing court should give substantial evidentiary weight to the merger price as an indicator of fair value"); *Union Ill. 1995 Inv. Ltd. P'ship v. Union Fin. Gp., Ltd.*, 847 A.2d 340, 357–58 (Del.Ch.2003) (holding the merger price, less expected synergies, was the "best indicator of value" where a merger resulted from a "competitive and fair auction, which followed a more-than-adequate sales process and involved the broad dissemination of confidential information to a large number of prospective buyers").

**26.** *See, e.g., Smith v. Van Gorkom*, 488 A.2d 858, 875 (Del.1985) ("[T]he fact of a premium alone does not provide an adequate basis upon which to assess the fairness of an offering price."); *El Paso*, 41 A.3d at 434–35 (finding reasonable probability of success on the merits of breach of fiduciary duty claim despite nominal 47.8% premium over pre-announcement market price); *Del Monte*, 25 A.3d at 818–19 (same despite nominal 40% premium); *Tele–Communications*, 2005 WL 3642727, at *1–2 (finding at the summary

RBC's faulty design prevented the emergence of the type of competitive dynamic among multiple bidders that is necessary for reliable price discovery. The process as structured only generated evidence of what one private equity buyer—Warburg—would pay with the expectation of achieving a low to mid–20% internal rate of return. Warburg believed that its large fund size gave it an advantage over the other private equity buyers in Rural's process because, post-deal, Warburg could invest additional equity capital in support of "a more aggressive acquisition case." Warburg knew that the "motley group" of competitors in the process lacked similar resources and that it did not need to incorporate as much of its anticipated gains in its price to outbid the other firms. If RBC had not run the Rural process in parallel with the EMS process, other private equity players with equally large funds could have participated, forcing up the price.

The timing of the Rural process also meant that Warburg did not have to worry about strategic bidders. Falck, a European company that already owned a substantial stake in Rural and was expanding aggressively into the American market, was itself in the middle of a change of control transaction and thus was not in a position to bid for Rural. EMS, of course, was in the middle of being acquired by CD & R. Although CD & R repeatedly expressed interest in acquiring Rural and indicated that it felt it could pay a higher price than any other bidder, CD & R could not submit a final proposal until after its acquisition of EMS closed. Davis pressed for the Company to stick to a tight time frame, and the Special Committee decided not to push back the bid deadline to accommodate CD & R. Without competition

to drive up the price, RBC's process succeeded only in discovering the amount that Warburg could comfortably finance and was willing to pay when bidding against a "motley group" of competitors and with the benefit of inside information about the seller's boardroom dynamics.

This confluence of factors meant that in the first quarter of 2011, when the Special Committee and RBC were selling Rural, the Company's value on a stand-alone basis exceeded what a private equity bidder willingly would pay. And that was precisely what RBC's December 2010 pitch book indicated. RBC valued Rural using a leveraged buyout model at $14.00–$17.70 per share, but valued the stand-alone business using a discounted cash flow model at $15.49–$21.27 per share. The near-term sale process that RBC and Shackelton drove prevented Rural from generating the higher values that could be achieved by allowing DiMino to develop Rural's business strategy with the opportunity for a later, better timed sale to a strategic buyer.

The evidence at trial established that the value of Rural as a going concern exceeded what stockholders received in the merger. Under the circumstances, RBC's aiding and abetting of the Board's breaches of fiduciary duty harmed Rural's stockholders.

## B. The Disclosure Claim

As a separate basis for liability, the plaintiffs contend that RBC aided and abetted the Board's breach of its fiduciary duty of disclosure. The plaintiffs identified several disclosure violations. This decision addresses only the two that have merit.

---

judgment stage that defendants had not demonstrated entire fairness despite 37% premium); *Gholl v. eMachines, Inc.*, 2004 WL

2847865, at *15 (Del.Ch. Nov. 24, 2004) (giving "little weight" to the "control premium argument" despite a premium of 96%).

### 1. The Existence Of A Fiduciary Duty Relationship

■ As with the sale process claim, the first element of a claim for aiding and abetting a breach of the fiduciary duty of disclosure is readily satisfied. As directors of a Delaware corporation, the members of the Board had a "fiduciary duty to disclose fully and fairly all material information within the board's control when it seeks shareholder action." *Stroud v. Grace*, 606 A.2d 75, 84 (Del. 1992); *accord Malone*, 722 A.2d at 12 ("The directors of a Delaware corporation are required to disclose fully and fairly all material information within the board's control when it seeks shareholder action.").

■ The "duty of disclosure is not an independent duty, but derives from the duties of care and loyalty." *Pfeffer v. Redstone*, 965 A.2d 676, 684 (Del.2009). When seeking injunctive relief for a breach of the duty of disclosure in connection with a request for stockholder action, a plaintiff need only show a material misstatement or omission. The plaintiff need not address the additional elements of causation and quantifiable monetary damages. *In re J.P. Morgan Chase & Co. S'holder Litig.*, 906 A.2d 766, 775 (Del.2006). When seeking post-closing damages for breach of the duty of disclosure, however, the plaintiff must prove quantifiable damages that are "logically and reasonably related to the harm or injury for which compensation is being awarded." *Id.* at 773.

■ A fact is material "if there is a substantial likelihood that a reasonable shareholder would consider it important in *deciding how to vote.*" *Rosenblatt v. Getty Oil Co.*, 493 A.2d 929, 944 (Del.1985) (quoting *TSC Indus., Inc. v. Northway, Inc.*, 426 U.S. 438, 449, 96 S.Ct. 2126, 48 L.Ed.2d 757 (1976)). The inquiry does not require "a substantial likelihood that [the] disclosure ... would have caused the reasonable investor to change his vote." *Id.* (same). The question is rather whether there is "a substantial likelihood that the disclosure of the omitted fact would have been viewed by the reasonable investor as having significantly altered the 'total mix' of information made available." *Id.* (same). "Whether disclosures are adequate is a mixed question of law and fact." *Zirn v. VLI Corp.*, 621 A.2d 773, 777 (Del. 1993).

### 2. The False Valuation Analysis

■ The plaintiffs proved at trial that the Proxy Statement contained materially misleading disclosures in the form of false information that RBC presented to the Board in its financial presentation. "The financial advisor's opinion of financial fairness for a proposed transaction is one of the most important process-based underpinnings of a board's recommendation of a transaction to its stockholders and, in turn, for the stockholders' decisions on the appropriateness of the transaction." *David P. Simonetti Rollover IRA v. Margolis*, 2008 WL 5048692, at *8 (Del.Ch. June 27, 2008).

Information that RBC provided to the Board in connection with its precedent transaction analyses was false, and that false information was repeated in the Proxy Statement. RBC told the directors that it used "Wall Street research analyst consensus projections" to derive Rural's EBITDA for 2010. The "consensus projections" were neither analyst projections, nor did they represent a Wall Street consensus. The figures were actually Rural's reported results, not projections, and RBC used the reported figures without adjusting for one-time expenses, which was contrary to the Wall Street consensus. The resulting figure that RBC used in the precedent transaction analysis was $69.8

million. The Proxy Statement elsewhere identified Rural's Adjusted EBITDA for 2010 as $76.8 million, which adjusted for one-time expenses, and identified Rural's Pro Forma Adjusted EBITDA as $83.7 million. JX 611 at 51. The Proxy Statement also noted RBC adjusted the guideline target companies' EBITDA in its precedent transaction analysis "to account for . . . certain one-time expenses." *Id.* at 39.

A stockholder reading the Proxy Statement would conclude, incorrectly, that RBC's precedent transaction range used the disclosed Adjusted EBITDA that added back one-time expenses and that the resulting figures were consistent with a Wall Street consensus. In their recommendations to their clients, ISS and Glass Lewis both interpreted $8.19 per share, the low end of the "consensus" range at 6.3x, as the true low end of RBC's precedent transaction analysis, and Glass Lewis advised that the transaction was at an attractive valuation relative to comparable deals in the emergency transport industry. JX 616 at 4(ISS); JX 610 at 5 (Glass Lewis).[27] Daniel testified that a stockholder looking at the "consensus" range would say, "This is an absolutely fair deal." 2 Trial Tr. 379. That is the problem. The "consensus" range was artificial and misleading, as was the low end of the "management" range. The information that RBC provided for the Proxy Statement about its precedent transaction analysis was material and false.

### 3. The Failure To Fully Disclose RBC's Conflicts Of Interest

 The plaintiffs proved at trial that the Proxy Statement contained false and misleading information about RBC's incentives. Information that bears on whether an investment bank faces conflicts of interest is material to stockholders when deciding how to vote on a merger and whether to seek appraisal:

> [I]t is imperative for the stockholders to be able to understand what factors might influence the financial advisor's analytical efforts. . . . A financial advisor's own proprietary financial interest in a proposed transaction must be carefully considered in assessing how much credence to give its analysis. For that reason, the . . . benefits of the Merger to [the investment banker], beyond its expected fee, must also be disclosed to [the] stockholders.

*Simonetti*, 2008 WL 5048692, at *8. "There is no rule . . . that conflicts of interest must be disclosed only where there is evidence that the financial advisor's opinion was actually affected by the conflict." *In re John Q. Hammons Hotels Inc. S'holder Litig.*, 2009 WL 3165613, at *16 (Del.Ch. Oct. 2, 2009); *cf. Lear*, 926 A.2d at 114 (requiring disclosure of CEO conflict of interest where CEO acted as negotiator; "Put simply, a reasonable stockholder would want to know an important economic motivation of the negotiator singularly employed by a board to obtain the best price for the stockholders, when that motivation could rationally lead that negotiator to favor a deal at a less than optimal price, because the procession of a deal was more important to him, given his overall economic interest, than only doing a deal at the right price.").

---

**27.** Glass Lewis also relied on RBC's comparable companies analysis, which it interpreted as "indicat[ing] [that] stand-alone Rural is valued lower than its most comparable peer on a forward multiples basis, but that the multiples implied by the proposed consideration are consistent with, or more attractive than, the multiples of the selected peer." JX 610 at 5. RBC did not use the comparable companies analysis for valuation purposes but misleadingly left the analysis in its presentation.

It is not only the amount and nature of a contingent fee that is relevant to an investment bank's interest in a transaction. "The relationships between investment banks and corporate management can run deep, and an investment bank often has business with the corporation and its management that span[s] more than one transaction." Steven M. Davidoff, *Fairness Opinions*, 55 Am. U.L.Rev. 1557, 1587 (2006). Where an investment bank is providing a fairness opinion for long-standing clients, it "may be influenced to find a transaction fair to avoid irritating management and other corporate actors who stand to benefit from the transaction," as "[t]his will ensure future lucrative business." *Id.; accord Simonetti*, 2008 WL 5048692, at *14 ("[T]he stockholders have every right to expect the Company to share with them any extraneous, substantial reasons UBS may have for seeing that the transaction is consummated.").

The Proxy Statement stated that RBC received the right to offer staple financing because it "could provide a source for financing on terms that might not otherwise be available to potential buyers of the Company...." JX 611 at 29. This statement was false. The Board never concluded that RBC could provide financing that might otherwise not be available, and no evidence to that effect was introduced at trial. In December 2010, RBC told the Special Committee that the credit markets were open and receptive to acquisition financing, and they remained so for the duration of the sale process.

Equally important, this partial disclosure imposed on the Rural directors a duty to speak completely on the subject of RBC's financing efforts. "Under Delaware law, when directors undertake to tell a story they must do it in a non-misleading manner." *Topps*, 926 A.2d at 77. The Proxy Statement does not describe how

RBC used the initiation of the Rural sale process to seek a role in the EMS acquisition financing, and it does not disclose RBC's receipt of more than $10 million for its part in financing the acquisition of EMS. The Proxy Statement says nothing about RBC's lobbying of Warburg after the delivery of Warburg's fully financed bid, while RBC was developing its fairness opinion. Munoz reviewed the Proxy Statement, but he did not look to see if these matters were addressed.

A stockholder reading the Proxy Statement would conclude, incorrectly, that RBC disclosed all of its conflicts and led a pristine process. Glass Lewis mistakenly believed that RBC was an "independent" financial advisor. JX 610 at 5. Glass Lewis was not aware that RBC designed the Rural process to serve its own interests and mistakenly concluded that "[t]he board, with the assistance of independent advisers, conducted a full auction process...." *Id.* at 6. Without knowing about RBC's conflicts, Glass Lewis inferred that "the board conducted a sufficiently thorough review that would be reasonably expected to generate the greatest possible value for Rural and its shareholders." *Id.* at 7.

ISS drew similar inferences. ISS believed, errantly, that "the company conducted a full auction process, established a special committee of independent directors to manage the sale process, and took steps to mitigate potential conflicts." JX 616 at 1. ISS concluded that "there are no concerning conflicts of interest." *Id.* ISS noted that the Board allowed RBC to offer buy-side financing, but incorrectly concluded that RBC had no other conflicts and that the Board took adequate steps "to mitigate potential conflict[s] of interest." *Id.* at 4.

### 4. RBC's Knowing Participation

■ RBC knowingly participated in both of the disclosure violations. RBC created the disclosure violation involving the "Wall Street research analyst consensus projections" by including false information in its valuation materials, which the directors then summarized. Only RBC knew the full extent of its conflicts, including its successful plan to use the Rural sale process to gain a place on the financing trees of the bidders for EMS and its late-stage push for a buy-side financing role from Warburg, including feverish discussions with Warburg on March 26, 2011, the day before the merger was approved and the same day that RBC was finalizing its valuation work.

### 5. Causally Related Damages

■ RBC's actions resulted in stockholders voting on the merger based on a proxy statement that contained materially false disclosures and omissions about RBC's valuation analyses and conflicts. Stockholders were denied the information necessary to make an informed decision whether to seek appraisal. Causation is satisfied. For the reasons already discussed, the evidence indicates that the fair value of Rural at the time of the merger exceeded what Warburg could finance comfortably and was willing to pay. *See* Part II.A.7, *supra.*

### C. The Remedy

The court is not yet in a position to determine an appropriate remedy. The parties' experts agreed at trial that Rural's value as a going concern is most reliably determined using the discounted cash flow ("DCF") methodology. The plaintiffs' expert, Kevin Dages, presented a conservative, balanced, and well-supported DCF model. This decision finds Dages's DCF valuation to provide persuasive evidence of fair value and adopts it as the general framework for the valuation analysis. The remainder of this section resolves a series of disputes between Dages and RBC's expert, Professor Thomas Lys. Using the inputs that the court has identified, Dages and Lys will submit revised expert valuations, which the court will use to make a decision on damages.

A reliable DCF valuation starts with management's contemporaneous projections.[28] DiMino and his team prepared reliable projections based on the business plan that he developed and the Board adopted. DiMino testified at trial that he felt management's projections were realistic and that he used his best understanding of the Company's direction and the best information available at the time when developing them. 2 Trial Tr. 404, 490. The evidence at trial demonstrated that Rural's growth strategy was reasonable and achievable. RBC agreed with management's projections, as did Warburg. The criticisms of the projections

---

28. *See, e.g., S. Muoio & Co. LLC v. Hallmark Entm't Invs. Co.*, 2011 WL 863007, at *19 (Del.Ch. Mar. 19, 2011) ("This Court has consistently recognized the importance of management's contemporaneous projections...."); *Andaloro v. PFPC Worldwide, Inc.*, 2005 WL 2045640, at *11 (Del.Ch. Aug. 19, 2005) (giving "heavy weight" to management projections, so long as "they are prepared under circumstances that do not undercut the court's confidence in their trustworthiness"); *Emerging Commc'ns*, 2004 WL 1305745, at *14 ("This Court has consistently expressed a preference for the most recently prepared management projections available as of the merger date."); *Cede & Co. v. JRC Acq. Corp.*, 2004 WL 286963, at *2 (Del.Ch. Feb. 10, 2004) ("[T]his Court prefers valuations based on management projections available as of the date of the merger.... Expert valuations that disregard contemporaneous management projections are sometimes completely discounted.").

advanced by RBC and Lys are contrary to the overwhelming weight of the evidence.

DiMino's five-year management projections did not address how to take into account the benefits of the acquisition program beyond 2016. Because the management projections anticipated that it would take five years for each acquisition to be fully integrated, Rural was not anticipated to reach a steady state until 2021 at the earliest. The parties' experts agreed that it would be inappropriate to apply a terminal value multiple to projected 2016 EBITDA that did not take into account the fact that the acquisitions would not yet be fully integrated. There are two ways to account for that fact: (i) extend management's projections by another five years to permit the first five years of acquisitions to reach a steady state, then derive Rural's terminal value using 2021 EBITDA, or (ii) derive Rural's terminal value in 2016—the end of the management projection period—but use normalized 2016 EBITDA or an elevated terminal value multiple. Warburg and Dages used the former approach; Lys used the latter. RBC notably did neither, resulting in an artificially low DCF valuation.

One apparent weakness of extending the projections is that as the analysis looks farther into the future, it becomes less reliable. However, the normalization approach has the same problem. Normalizing the EBITDA figure or adjusting the terminal value multiple requires assumptions about future states of the world, but those assumptions are hidden in altered numbers. As between the two methods, the technique of extending the projections deals with the valuation difficulties more forthrightly by making its assumptions explicitly and enabling them to be evaluated and tested. The revised expert analyses will use the explicit method of extending the projections and employ the projections

that Dages set out in Exhibits 5A–5C of his report.

The next critical input for a DCF model is the discount rate. Dages used the standard capital asset pricing model ("CAPM") that adds a size premium to reflect the superior historical performance of smaller companies. "CAPM ... should be used where it can be deployed responsibly." *In re Appraisal of The Orchard Enters., Inc.,* 2012 WL 2923305, at *17 (Del.Ch. July 18, 2012), *aff'd sub nom. The Orchard Enters., Inc. v. Merlin P'rs, LP,* —— A.3d ——, 2013 WL 1282001 (Del. Mar. 28, 2013) (TABLE). Lys used both CAPM and a three-factor Fama–French model, but RBC has not argued that CAPM cannot be deployed responsibly here. The revised expert submissions will use CAPM.

The parties' experts agreed on a risk-free rate of 4.3%. Dages used both the historical equity risk premium and the supply side equity risk premium, which has become the preferred input. *See Global GT LP v. Golden Telecom, Inc.,* 993 A.2d 497, 514–16 (Del.Ch.), *aff'd,* 11 A.3d 214 (Del.2010). Dages used a size premium of 2.94% based on data from Ibbotson Associates, which is a generally accepted method. *See Orchard Enters.,* 2012 WL 2923305, at *22. This decision adopts Dages's risk-free rate and size premium. The revised expert submissions will include two calculations, one using the historical equity risk premium and another using the supply side equity risk premium.

The parties disagreed on beta. Dages used Rural's observed beta of 1.2, derived from Bloomberg weekly data measured against the S & P 500 for two years. Lys used monthly measurements and a five year look-back period. In the abstract, both are acceptable methods. *See Andaloro,* 2005 WL 2045640, at *15 & n. 61. In this specific case, both measures are problematic because the reliability of an ob-

served beta depends on an efficient trading market. For a company like Rural that is traded on a major exchange, "[t]urnover measured by average weekly trading of … 1% would justify a substantial presumption" of market efficiency. 5 Bromberg et al., *Bromberg & Lowenfels on Securities Fraud* § 7:484 (2d ed. 2003). Rural's stock did not start meeting that benchmark on a reasonably consistent basis until the second week of September 2009. The parties will recalculate beta using Dages's methodology and a measuring period from September 11, 2009, to March 25, 2011.

For his cost of debt, Dages used 7.5%, based on the yield to maturity of an index of B-rated bonds on March 25, 2011. This analysis credibly assumed that Rural would be able to refinance its debt at a similar rating within approximately ten years, at which time the Company would have a similar capital structure. RBC had used 7.3%, based on the Company's new term loan and LIBOR rates. The parties agreed that Rural's debt-to-capital ratio was 45%. This decision adopts these inputs.

The experts will use these determinations to prepare revised DCF valuations of Rural. Like the DCF valuations presented at trial, the revised valuations shall include a matrix showing sensitivities.

## D. Contribution

RBC has raised a defense of contribution, arguing that any monetary liability it bears must be reduced by either the other defendants' share of liability or the amount the other defendants paid to settle the case, whichever is greater. The plaintiffs dispute this view. The pre-trial briefs did not address contribution, and the post-trial briefs devoted a total of five pages to the issue. At post-trial argument, the parties focused on the question of liability and did not address contribution. Because a decision on the scope of contribution could have a significant effect on the extent of RBC's liability, the parties will provide supplemental briefing on this issue. *See, e.g., In re Jones*, 2006 WL 2035714, at *6 (Del.Ch. July 13, 2006) (ordering a supplemental hearing and additional briefing to address an "important" issue that was not raised until post-trial briefing); *Cochran v. Stifel Fin. Corp.*, 2000 WL 1847676, at *5 (Del.Ch. Dec. 13, 2000) (declining to consider an argument for purposes of a motion to dismiss where the court "[had] not had the benefit of briefing on [the] question"), *aff'd in pertinent part*, 809 A.2d 555 (Del.2002).

## E. Fee–Shifting

The plaintiffs have asked for fee-shifting under the American Rule in light of the strained testimony provided by RBC's witnesses at trial and the extensive conflicts between the evidentiary record and the assertions in RBC's pre-trial briefs. "Although there is no single definition of bad faith conduct, courts have found bad faith where parties have unnecessarily prolonged or delayed litigation, falsified records or knowingly asserted frivolous claims." *Johnston v. Arbitrium (Cayman Is.) Handels AG*, 720 A.2d 542, 546 (Del.1998) (footnotes omitted). "Bad faith conduct also can include reversing position on issues and changing testimony to suit the moment." *Trados II*, 73 A.3d at 78 (citing *Montgomery Cellular Hldg. Co. v. Dobler*, 880 A.2d 206, 227–28 (Del. 2005)). "The purpose of [the] 'bad faith' exception is to 'deter abusive litigation in the future, thereby avoiding harassment and protecting the integrity of the judicial process.'" *Kaung v. Cole Nat'l Corp.*, 884 A.2d 500, 506 (Del.2005) (quoting *Schlank v. Williams*, 572 A.2d 101, 108 (D.C.1990)).

As with the issue of contribution, the parties have not thoroughly briefed the question of fee shifting. The plaintiffs did, however, identify various examples of RBC's alleged misrepresentations and changes in position. RBC's arguments before trial included the following:

- "RBC was not asked to provide a fairness opinion until after it was clear that there would be no staple financing." RBC Letter to Ct. of Mar. 14, 2013 at 2 n. 1.

- "Warburg made clear that it would not use RBC's financing, hence RBC had no incentive to favor Warburg, and there is no record of RBC favoring any bidder." RBC's Pre–Trial Opening Br. at 1.

- "The RBC team offering the staple financing was distinct and separate from the RBC team advising [Rural] on the sale of the Company." *Id.* at 10 n. 43.

- "By March 23, 2011, RBC and the Special Committee were aware that RBC would not be providing staple financing for the Transaction." *Id.* at 13.

- "RBC could not have been motivated to find the Transaction fair, as it knew it would not be providing staple financing to Warburg *before* [Rural] requested a fairness opinion." *Id.* at 29.

- "Unlike *Del Monte*, RBC was not secretly meeting with Warburg without [Rural's] consent." *Id.* at 32 n. 133.

These representations contrasted sharply with the evidence at trial. The plaintiffs have identified other positions taken by RBC that the evidence likewise called into question.

The court has not reached any conclusions, but given the magnitude of the conflict between RBC's claims and the evidence, it seems possible that the facts could support a bad faith fee award. At a later stage of the case, the plaintiffs may make a formal motion jointly with any application they wish to make for a fee award based on the creation of a common fund.

## III. CONCLUSION

RBC is liable for aiding and abetting the individual defendants' breaches of the duty of care and the duty of disclosure. Based on the rulings in this decision, the parties will provide revised expert submissions identifying a range of fair value for Rural at the time of the merger. The parties also shall provide further briefing regarding RBC's contribution defense. After the court addresses these matters and establishes the scope of the remedy, the plaintiffs may make a fee application.